OPINION OF THE COURT
Titone, J.
 The Central Pine Barrens is an area of Long Island that once encompassed approximately 250,000 acres in central Suffolk County but has now been reduced to some 100,000 acres of relatively undeveloped land. The Pine Barrens is an indispensable component of the aquifer system that is the sole natural source of drinking water for over two and a half million inhabitants of Long Island. Indeed, because of its critical ecological significance, the Pine Barrens has been the subject of protective legislation at all levels of government. The specific issue presented here is whether the State Environmental Quality Review Act (SEQRA) and its accompanying regulatory scheme should be construed to require the preparation of a cumulative impact statement in connection with the more than 200 development projects that are currently proposed for the Central Pine Barrens region. Contrary to the holding of the Appellate Division, we conclude that the statutory and regulatory criteria for mandatory cumulative impact statements cannot, and should not, be stretched to cover this unique problem. Accordingly, there should be a reversal.
L
The sole natural source of drinking water for much of Long Island is its aquifer system, which is comprised of three subsoil water-bearing layers known as the Upper Glacial Aquifer, the Magothy Aquifer and Lloyd Sands. The system is regularly replenished by precipitation, which infiltrates the land surface in the Pine Barrens region, enters the system through the Upper Glacial Aquifer and percolates downward to the lower layers through a hydrological phenomenon known as "deep flow recharge.” Because the Pine Barrens’ soils are highly porous, the region provides an excellent vessel *509 for the storage and distribution of precipitation. Further, the precipitation that enters the system through the soil in the Pine Barrens radiates out to the north, south and east, feeding the entire aquifer and diluting the contaminants that may have entered the system from other sources.
Unfortunately, the same characteristics that make the Central Pine Barrens an ideal source of recharge also make it especially vulnerable to the risk of pollution, since its permeable soil is not readily capable of filtering or degrading contaminants. As is indicated by at least one study, once the deep recharge system in this area becomes contaminated, it would take centuries to flush it sufficiently to return it to clean groundwater quality. Thus, as a practical matter, contamination would be irreversible. Moreover, because precipitant entering through the Pine Barrens region radiates outward into the rest of the aquifer system, any contamination originating in this area would have serious consequences for the entire Long Island groundwater supply. It is thus apparent that the protection of the Pine Barrens region from sources of pollution is vital to the health of Long Island’s human population.
The Pine Barrens also has unique ecological significance because of its unusually high concentration of species that have officially been classified as endangered, rare or subject to the protection of Federal law (see, 16 USC § 1531 et seq.; see also, ECL 11-0535; 6 NYCRR part 182). The Pine Barrens contains over 300 species of vertebrate animals, 1,000 species of plants and 10,000 species of insects and other invertebrate animals, many of them rare and restricted to Pine Barrens or other similar areas. Among the more important species inhabiting the Pine Barrens are the tiger salamander, the red-shouldered hawk, the northern harrier and the mud turtle (see, 6 NYCRR 182.6). The Pine Barrens’ singular geological and meteorological history, as well as its highly unusual soil, vegetation and water levels, make it particularly hospitable to a wide variety of life forms whose survival could well be threatened by development. The need for caution in this area is especially acute because development in one part of the region could have unforeseen consequences in another, as migratory routes are disrupted, food supplies are destroyed, alien species are given berth to develop and environmentally crucial wetlands are permitted to dry up. Furthermore, development may encourage extinguishment of the ecologically necessary wildfires that periodically burn through the region.
*510 II
In recognition of the ecological importance and fragility of the Long Island Pine Barrens, laws and policies have been adopted at all government levels to protect the area from unbridled development. In 1978, the Federal Environmental Protection Agency designated the underlying Long Island aquifer a "sole source aquifer” after noting that the aquifer system is the principal source of drinking water for Nassau and Suffolk Counties and is highly vulnerable to contamination (43 Fed Reg 26611 [June 21, 1978]; see, 42 USC § 300h-3 [e]). Additionally, pursuant to the Federal Water Pollution Control Act (33 USC § 1288), the Long Island Regional Planning Board released a comprehensive waste treatment plan (the 208 study), which mapped Hydrogeologic Zone III as an area virtually coextensive with the Central Pine Barrens and declared that it should be protected from contamination through land use restrictions and other controls.
In 1974, the New York State Legislature adopted the first in what was to become a series of enactments designed to protect the Pine Barrens by amending the Environmental Conservation and Public Health Laws to provide for special review of business, commercial and industrial uses in Suffolk County with a view toward preserving the purity of the groundwater (L 1974, ch 802). Ten years later, the Legislature adopted the Landfill Law, which prohibits the placement of new landfill sites in Zone III and most of the Central Pine Barrens (L 1983, ch 299; see also, Matter of Town of Islip v Cuomo, 64 NY2d 50). The same Legislature authorized the Department of Environmental Conservation (DEC) to prohibit land uses involving hazardous wastes in certain portions of Long Island because of the "direct relationship [that] exists between land use activities and the quality of the groundwater reservoir beneath” (L 1983, ch 951, § 1). In 1984, a State-wide framework for water resource planning was established and, pursuant to the new statute, the DEC issued a report, the Long Island Ground Water Management Plan, which singled out the Long Island Pine Barrens for protection (L 1984, ch 509; see, ECL art 15).
The centerpiece of the State legislation affecting the Pine Barrens is the Sole Source Aquifer Special Groundwater Protection Areas Law (L 1987, ch 628), which is codified at ECL article 55 and specifically includes the Central Pine Barrens in the Suffolk County Towns of Brookhaven, Riverhead and Southampton as one of the nine listed Special Groundwater *511 Protection Areas (see, ECL 55-0113 [1] [g]). The statute contemplates the creation of a comprehensive management plan to govern development within the designated areas (see, ECL 55-0115). The goals underlying article 55 have also been reflected in subsequent State legislation, including the Long Island Pine Barrens Maritime Reserve Act (L 1990, ch 814, codified at ECL art 57), several amendments to strengthen both article 55 and the Maritime Reserve Act (L 1991, ch 238; L 1992, ch 271) and, finally, an amendment to SEQRA requiring every Environmental Impact Statement concerning a project affecting the Pine Barrens to discuss the "effects of any proposed action on, and its consistency with, the comprehensive management plan” (L 1990, ch 219, adding ECL 8-0109 [2] [i]; [9]).
At the local level, the Suffolk County Legislature has adopted laws encouraging towns and villages within the Pine Barrens Zone to develop "unified policies” with regard to land use within that zone (Local Laws, 1984, No. 7 of County of Suffolk), designating the Central Pine Barrens as a Critical Environmental Area pursuant to SEQRA (Local Laws, 1987, No. 24; see, 6 NYCRR 617.4 [former (j)] [now subd (h)]), creating a Pine Barrens Wilderness and a Water Protection Preserve (Local Laws, 1987, No. 40) and establishing funding mechanisms for projects to protect the drinking water (Local Laws, 1988, No. 35). Specialized land use management plans to protect the drinking supply have also been advocated in local legislation adopted in the Towns of Southampton (Local Laws, 1984, No. 1), Brookhaven (Resolution No. 10, adopted June 20, 1989; see also, Brookhaven Town Code ch 80) and Riverhead (Zoning Code art XXXII).
III
At issue in this appeal are some 224 discrete proposed development projects that are scattered throughout the Central Pine Barrens area in the Towns of Brookhaven, River-head and Southampton. Some of these projects have already received local approval, while others are still awaiting review.
Petitioners, consisting of an incorporated society and several individuals interested in the preservation of the Pine Barrens, commenced the present proceeding to invalidate the approvals that have already been given and to enjoin respondents from taking any further action in relation to the pending proposals without first complying with SEQRA. Specifically, petitioners claim that SEQRA has been and is being violated here be *512 cause no consideration has been given to the cumulative environmental impact of all pending development projects in the Central Pine Barrens area.*
Relying on the fact that the comprehensive management plan mandated by ECL article 55 has not yet been adopted at any level of government, the trial court ruled that the municipal respondents were not obliged to consider the cumulative impact of all of the pending projects within the region. The Appellate Division reversed this aspect of the trial court’s ruling. Citing Matter of Save the Pine Bush v City of Albany (70 NY2d 193) and other cases in which the use of cumulative impact statement has been required, the Court concluded that, by virtue of their presence in the legislatively protected Central Pine Barrens area, the 224 projects in issue are sufficiently "related” to fall within the mandatory cumulative impact rule of 6 NYCRR 617.11 (a) (11) and (b). After its decision, the Appellate Division granted respondents leave to appeal, certifying the following question of law: "Was so much of the opinion and order of this court dated [March] 9,1992, as modified the order and judgment of the Supreme Court, Suffolk County, entered March 28, 1991, properly made?”
IV.
SEQRA requires the preparation of an Environmental Impact Statement for any government-sponsored or government-approved "action” that may have "a significant effect” on the environment (see, ECL 8-0109 [2]). One criterion for the "significant effect” determination is the existence of "two or more related actions * * * none of which has * * * a significant effect * * * but when considered cumulatively would meet one or more of the [other regulatory significant effect] criteria” (6 NYCRR 617.11 [a] [11]). For purposes of determining whether an action meets any of those regulatory criteria, "the lead agency must consider reasonably related long-term, short-term and cumulative effects, including other simultaneous or subsequent actions which are: (1) included in any long-range plan of which the action under consideration is a part; (2) likely to be undertaken as a result thereof; or (3) dependent thereon” (6 *513 NYCRR 617.11 [b] [emphasis supplied]). In all other circumstances, consideration of the cumulative effects of projects other than the one immediately proposed is permissible but not mandatory (see, Matter of Save the Pine Bush v City of Albany, supra, at 205; see also, 6 NYCRR 617.15 [a] [1]).
In a series of recent decisions, this Court has considered the circumstances in which a cumulative impact study is required pursuant to the foregoing rules (Matter of Stewart Park & Reserve Coalition v New York State Dept, of Transp., 77 NY2d 970, affg 157 AD2d 1; Matter of Village of Westbury v Department of Transp., 75 NY2d 62; Akpan v Koch, 75 NY2d 561; Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, supra; Chinese Staff & Workers Assn, v City of New York, 68 NY2d 359). Although 6 NYCRR 617.11 (a) (11) speaks in terms of "related actions,” this Court has held that common ownership of the pending projects is not necessarily a prerequisite for a mandatory cumulative impact study. Rather, in some circumstances, the "relatedness” element may be satisfied if "the project at issue * * * is * * * part of a larger plan designed to resolve conflicting specific environmental concerns in a subsection of a municipality with special environmental significance” (Matter of Save the Pine Bush v City of Albany, supra, at 206; accord, Chinese Staff & Workers Assn, v City of New York, supra).
Relying on this flexible formulation, petitioners contend that the 224 projects at issue in this case are "related” because they all involve property within the Central Pine Barrens region, an area that is both ecologically sensitive and subject to a large body of protective legislation. However, petitioner’s argument misconstrues our holdings by equating the notion of a general governmental policy of protecting a particular region with the idea of a governmental plan. The distinction is significant because, as will be discussed below, the existence of a broadly conceived policy regarding land use in a particular locale is simply not a sufficiently unifying ground for tying otherwise unrelated projects together and requiring them to be considered in tandem as "related” proposals pursuant to 6 NYCRR 617.11 (a) (11) and (b).
The distinction may best be illustrated by comparing the circumstances presented here with those presented in Matter of Save the Pine Bush v City of Albany (supra) and Chinese Staff & Workers Assn, v City of New York (supra), on which petitioners rely. In each of those cases, the municipality had *514 enacted a local ordinance containing a plan to set aside a discrete development district without destroying the district’s existing character. In Chinese Staff, the municipality had created a special urban zoning district with seven specific building sites to encourage new residential development while preserving the well-defined community’s unique ethnic and architectural characteristics. Similarly, in Save the Pine Bush (supra), which also involved "pine barrens” land, the municipality had implemented its desire to expand commercial development while preserving the area’s environmental integrity by creating a 550-acre zone in which single-story office buildings or other similar projects would be permitted. In addition to establishing this special development district, the municipality had prescribed a set of site-review procedures and delineated criteria to be used in determining which proposed projects should be approved.
It was in those contexts, which both entailed actual municipal development plans, that this Court noted the applicability of 6 NYCRR 617.11 (a) (11) and (b) and held that the "lead agencies” were required to consider the cumulative impact of other pending proposals within the special districts before deciding to approve the individual applications before them. Despite the absence of common ownership or functional connection, we concluded that the requisite "relatedness” among the projects was established because the municipalities’ plans, in and of themselves, provided a sufficiently cohesive framework for mandatory cumulative impact review. In other words, the decisive factor in both Chinese Staff and Save the Pine Bush was the existence of a "larger plan” for development (see, 70 NY2d, at 206, supra), not the proposed projects’ common geographical base or the existence of a generally stated governmental policy to protect the region from unbridled development.
Here, despite the myriad of legislative initiatives involving the Long Island Pine Barrens, there is no plan analogous to the ordinance establishing a special urban zoning district in Chinese Staff or the local statute creating a special light-industry district in Save the Pine Bush. Rather, there is merely a host of Federal, State and local statutes designating the region as an ecologically sensitive one and mandating the development of adequate land-use controls. Consequently, there is no cohesive framework for relating the 224 projects in issue to each other. The only element they share — their common placement in the Central Pine Barrens — is an insuffi *515 cient predicate under the present set of administrative regulations for mandatory cumulative impact analyses as preconditions to a myriad of local land use determinations.
Moreover, there exists an even more fundamental reason why requiring a cumulative impact study would not be an appropriate solution to the very grave environmental and political problems presented by development proposals within the Central Pine Barrens. The cumulative impact assessment that petitioners envision would be, in essence, a vehicle for the many involved "lead agencies” to engage in comprehensive and long-range planning for the development of this vast area of land which has been designated for special protection. While such an exhaustive and thorough approach to evaluating projects affecting this region is unquestionably desirable and, indeed, may well be essential to its preservation, petitioners’ suggestion that it be accomplished through the processes mandated by SEQRA is inconsistent with the very legislation on which petitioners rely.
Under SEQRA, the individual agency having the primary authority to approve or disapprove a particular project application is responsible for making the environmental impact assessment (see, ECL 8-0105 [7]; 8-0109, 8-0111). With regard to the Central Pine Barrens, in contrast, the Long Island Regional Planning Board is designated as the over-all "planning entity” (ECL 55-0113 [5]). Acting with the advice of the statutorily mandated Special Groundwater Protection Area Advisory Council (ECL 55-0113 [6]), the Regional Planning Board is responsible for devising a "comprehensive management plan” that includes "specific watershed rules and regulations,” "detailed boundaries] of the special groundwater protection area,” "[a] resource assessment [of] * * * the amount and type of human development and activity which the ecosystem can sustain,” "[p]roposal[s] of limits on land uses that might have an adverse impact on water quality and/or recharge capabilities,” "specific techniques [such as] clustering, large lot zoning * * * and other innovative measures * * * to achieve the objectives of this [statute],” and, most significantly, "[a] program for local governmental implementation of the comprehensive management plan” (ECL 55-0115 [3]-[5], [8], [9], [11]). Thus, the Legislature plainly contemplated a centralized approach to planning in this area, rather than individual decision-making by the various "lead agencies,” acting in accordance with their own local policies and priorities. While the Regional Planning Board lacks the authority to require local *516 planning entities to follow its plan, the Legislature expressly charged it with finding a mechanism to implement a regional plan. That charge plainly belies petitioners’ argument that the Legislature intended implementation of regional planning to occur piecemeal through the actions of individual lead agencies and cumulative impact studies under SEQRA or, for that matter, through the unfeasible "cooperative venture” that petitioners espouse. Likewise, the functions that might otherwise be served by the completion and use of a cumulative Environmental Impact Statement, i.e., acquiring an overview of impending land development proposals, appreciating the totality of the potential environmental consequences and avoiding the pitfalls of piecemeal decision-making (see generally, Matter of Stewart Park & Reserve Coalition v New York State Dept, of Transp., 157 AD2d 1, 9-10, affd 77 NY2d 970, supra) — are, in this instance, to be served by a comprehensive management plan that the Regional Planning Board is responsible for preparing.
Finally, the facts in this case demonstrate the need for centralized planning by a single regional agency, as mandated by ECL article 55. The Central Pine Barrens area spans three separate townships within Suffolk County and affects the aquifer system on which much of Long Island depends. The 224 projects that are at issue in this litigation involve a diverse range of activities requiring approvals by a wide number of agencies at different levels of government. As Justice Thomas Sullivan observed in his dissenting opinion below (178 AD2d 18, 47-48), there currently exists no legislatively prescribed mechanism for these agencies to pool their information or share their respective decision-making prerogatives. Thus, as the Legislature foresaw, the existing system of land-use planning in the region is plainly not equal to the massive undertaking that effective long-range planning would require, and some other system devised by a larger planning entity must be substituted.
Petitioners would have us effect this substitution by mandating the preparation of a cumulative impact study, designating the Suffolk County Health Department as "lead agency,” recommending the use of a "Generic Environmental Impact Statement” where feasible (see, 6 NYCRR 617.15), and directing that the required studies be funded principally by imposing the cost on the applicants pursuant to ECL 8-0109 (7) (a) (see, 6 NYCRR 617.17 [a]). However, even if this proposal were sufficient to overcome the many existing hurdles — a proposi *517 tian that is itself subject to doubt, we could not adopt this course of action for the simple reason that it would be in direct conflict with the choice that the Legislature has already made to give the Regional Planning Board the authority to design "[a] program for local governmental implementation of the comprehensive management plan” (ECL 55-0115 [11]).
For similar reasons, we reject petitioners’ contention that a legislative intent to mandate cumulative impact review under SEQRA may be inferred from ECL 8-0109 (9), which provides that an Environmental Impact Statement for projects affecting the Central Pine Barrens "shall meet the requirements of the most detailed environmental impact statement required by this section or by any * * * rule or regulation promulgated pursuant to this section.” This general directive certainly was not intended to mandate the substitution of SEQRA’s methods for the comprehensive, bicounty planning process contemplated by article 55.
Petitioners have expressed frustration because of the prolonged delay in the creation of the comprehensive management plan that was mandated by ECL 55-0113 (5) and 55-0115. Although article 55 was adopted in 1987, it was apparently not until August of 1991 that the Regional Planning Board produced a preliminary draft for informal circulation (see, 178 AD2d, at 42, n 1, supra [Sullivan, J., dissenting]), and it remains unclear when a final plan will be ready for submission to the Department of Environmental Conservation (see, ECL 55-0117). In view of the gravity of the risk of irreversible harm to the environment, as well as the urgency of the problem (as demonstrated by the pendency of at least 224 development projects affecting the region), such a leisurely pace is clearly counterproductive, particularly in light of the protective values long espoused by the Legislature. We in the judiciary are not free to piece together statutes and regulations that were never meant to address a problem of this magnitude in order to fill the gap left by the responsible planning entity’s inaction. As was noted by the dissenter in the Court below, the cumulative impact statement requirement of 6 NYCRR 617.11 (a) (11) and (b) is not fairly applicable in these circumstances, and, further, is not an adequate substitute for the specific ameliorative measures that the Legislature has expressly prescribed. To the extent that those measures have proven deficient, the solution must be devised by the Legislature, which is responsible for crafting sensible deadlines and mandating prompt action by the designated *518 planning bodies to address this matter of urgent public concern (see, ECL 57-0115).
Accordingly, the order of the Appellate Division should be reversed, with costs, the order and judgment of the Supreme Court reinstated, and the certified question answered in the negative.
Acting Chief Judge Simons and Judges Kaye, Hancock, Jr., Bellacosa and Smith concur.
Order reversed, etc.

 Petitioners also argued below that SEQRA requires the locality to consider public acquisition as an alternative to approving proposals to build on land within the Central Pine Barrens (see, 6 NYCRR 617.14 [¶] [5]). Both the trial court and the Appellate Division rejected this argument, and the issue is not before us on this CPLR 5602 (b) (1) appeal by respondents.