Malcolm SUSS, Plaintiff,

v.

AMERICAN SOCIETY FOR the PREVENTION OF CRUELTY TO ANIMALS, ASPCA Officer Ramon, ASPCA Officer McDonald, and the City of New York, Defendants.

No. 92 CIV. 2275 (VLB).

United States District Court,
S.D. New York.

May 31, 1993.

184

Arnold S. Kronick, Lehrman Kronick & Lehrman, White Plains, NY, for plaintiff.

John P. Woods, Asst. Corp. Counsel, New York City, for municipal defendants.

Brian J. Powers, Caulfield, Galvin, Heller, Harris & Colligan, New York City, for ASPCA defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case, brought under the Fourth Amendment, involves the need to reconcile human rights with the obligation to protect other species from harm caused by human activity. It also presents the question of whether exercise of sovereign powers of compulsion may be delegated to private entities.[1]

After the discovery that a cat was trapped between closely adjacent walls of two buildings, peace officers of a private organization, the Society for Prevention of Cruelty to Animals ("ASPCA"), determined that saving the feline required breaking through the exterior wall of a building occupied by a corporation owned by plaintiff.

Without seeking a warrant through personal appearance or by telephone, or attempting to reach the owner of the building, ASPCA personnel secured the assistance of the New York City Fire Department to break through the exterior wall in an unsuccessful attempt to save the cat, which was later destroyed.

Plaintiff brings this suit alleging violations of federal constitutional rights pursuant to 42 U.S.C. § 1983. Defendants have moved to dismiss the complaint or for summary judgment pursuant to Fed.R.Civ.P. 12 and 56.

I deny the motions insofar as they seek a ruling that no genuine issue of fact exists as to whether or not Fourth and Fourteenth Amendment violations occurred. I deny them without prejudice with regard to (a) responsibility of the individual defendants and the City, and (b) plaintiff's claim for monetary damages, for lack of adequate factual development to permit a ruling at this time. See *Mahoney v. Hankin,* 844 F.2d 64 (2d Cir.1988); *Goddard v. Urrea,* 847 F.2d 765 (11th Cir.1988).

The question of qualified immunity has not been fully briefed on the present motions, nor has there been adequate factual development to permit me to determine whether summary judgment should be granted in favor of one or more defendants on that ground. Since I do not regard qualified immunity as being raised by the present motions, defendants may file a separate motion directed to that issue without further leave.

### II

Legal authority supports reasonable governmental action to protect non-human species from untoward effects of cruel or ill-advised human activity.

At one time, human activity had a minimal impact on other species and their role in the earth's complex balances.[2] With the exponential growth of human technological knowledge, mankind's power to influence the massive cycles of the planet including the role of other species increased dramatically. Awareness of the importance of human actions and their long-term as well as immediate effects for good or ill has now begun to be reflected in our legal and institutional structures. If a single viewpoint can be said to inform the legal aspects of this awareness

---

1. See *Yakus v. United States,* 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944) (Stone, C.J.); *Eubank v. Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912).

2. See G. Childe, *What Happened in History* (1946).

it is that of responsible stewardship,[3] flowing from the basic long-recognized principle that power of whatever kind implies responsibility.[4]

Stewardship has been recognized in affirmative steps to promote environmentally sound technologies[5] that will assist in making it possible to preserve habitats important to biological diversity. Apart from such affirmative steps, stewardship requires protective efforts. These include effective enforcement of procedures for preserving environments necessary to support other species, and for precluding undue injury to other species from improper human activity.[6] The core concept of prohibition of cruelty to animals is now part of a much broader legal recognition of the need for wise use of human power over diverse forms of non-human life.

These legal requirements flowing from the concept of stewardship are fully consistent with continuing respect for constitutional rights of people,[7] although there is no requirement that any single specific action be taken regardless of ill consequences.[8] Adherence to principles designed to protect and foster traditionally recognized human rights is also crucial to continued effective species protection, which would hardly be supported were the need to protect species to be construed as authorizing roughshod disregard of constitutional guarantees.

III

On August 13, 1991, at approximately 6:00 p.m., the New York City ("NYC") fire department responded to a call that a cat had been trapped between two commercial buildings at 220 E. 138th Street in the Bronx. Efforts to extricate the cat were unsuccessful. The firefighters then made a report to the ASPCA which sent two ASPCA officers, defendants Roman and McDonald, to the scene. Roman and McDonald arrived at about midnight.

The ASPCA officers determined that in order to rescue the cat they would have to break into the premises of plaintiff Suss's business, Gotham Plastics ("Gotham"), and break through the wall of the commercial building. They did not seek a warrant by telephone or otherwise, but enlisted the assistance of the firefighters to break through.

A short while after the rescue operation had begun, Suss arrived, and observed that the two ASPCA officers and six firefighters had broken into his building. Within minutes angry words were exchanged. Suss grasped a metal pipe and appeared to seek to use it; a struggle ensued, and ultimately, Suss was restrained and arrested by the ASPCA officers and firefighters. Subsequently, Suss was transported to the 40th Precinct where he was charged with feloni-

---

3. See Thomas, "How Should Humans Pay Their Way?," N.Y. Times, Aug. 24, 1981 at A15.

4. See *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (Stone, C.J.) (articulating principle that statutorily created exclusive collective bargaining authority carries with it duty of fair representation of all employees in the bargaining unit).

5. In additional to providing for technology evaluation pursuant to the Technology Assessment Act, 2 U.S.C. § 471 *et seq.*, Congress has established procedures for identifying affirmatively desirable critical technologies to be promoted by public and private sector activity. 42 U.S.C. §§ 6686–87, 10 U.S.C. § 2521.

For historical background from the period of the "gas-line" crisis of the 1970s, see S. 3111, 94th Cong., 1st Sess. (1976); 122 Cong.Rec. pt. 5, 94th Cong., 2d Sess. at 5695 (March 9, 1976); 121 Cong.Rec. pt. 14, 94th Cong., 1st Sess. 18, 773–75 (June 12, 1975); Worsinger, "New Tech-

nologies and Antitrust," 47 N.Y.S.B.J. 651 (1975), reprinted in 81 Case & Comment 33 (1976); Editorial, 133 America magazine 84 (Aug. 30, 1975); *Legal Strategies for Industrial Innovation* (Shepard's/McGraw–Hill 1982).

6. See, e.g., Marine Mammal Protection Act, 16 U.S.C. § 1401 *et seq.*

7. Freedom of expression protected by the First Amendment permitted concerns of the kind discussed here to become effective where such rights were protected; whereas in societies suffering from dictatorial regimes this was delayed until such regimes were superseded.

8. Steps to protect endangered species are mandatory, but no single means of doing so is required by the Endangered Species Act, 16 U.S.C. § 1532; see also *Long Island Pine Barrens Soc'y v. Planning Board*, 80 N.Y.2d 500, 591 N.Y.S.2d 982, 606 N.E.2d 1373 (1992).

ous assault, resisting arrest, and a violation of the Agriculture and Markets Law.[9]

### IV

■ The Fourth Amendment applies to state agencies and those triggering state action by virtue of the due process guarantees of the Fourteenth Amendment; it bars unreasonable seizures and absent special circumstances it requires warrants issued by a neutral magistrate prior to searches or seizures for either administrative or criminal investigative purposes. *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

■ The ASPCA, although a private entity, was a state actor in this situation because: (1) the ASPCA cannot carry out its statutory mission without governmental assistance and it relies on its contract with the city to operate, (2) its services involve governmental functions and (3) the break-in here was done under an assumption of sovereign powers of compulsion. See *Edmonson v. Leesville Concrete Co.*, — U.S. —, —, 111 S.Ct. 2077, 2083, 114 L.Ed.2d 660 (1991); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *United States v. Wiseman*, 445 F.2d 792 (2d Cir.), *cert. denied* 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 287 (1971); *Howard Gault Co. v. Texas Rural Legal Aid*, 848 F.2d 544, 552–57 (5th Cir. 1988).

■ In *Edmonson v. Leesville*, the Court recognized as state action a private party's exercise of specifically delegated public sector authority. Whether conduct constitutes state action under the Fourteenth Amendment or "under color of state law" pursuant to § 1983 presents the same question. See *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982). Joint interference of state agents and private parties with private rights constitutes state action attributable to both public and private sector participants. See generally, e.g., *Soldal v. Cook Cty.*, — U.S. —, —, 113 S.Ct. 538, 543, 121 L.Ed.2d 450 (1992); *Georgia v. McCollum*, — U.S. —, — – —, 112 S.Ct. 2348, 2355–2356, 120 L.Ed.2d 33 (1992); *Lugar, Adickes* and *Price, supra.*

### V

■ A seizure for purposes of the Fourth Amendment (applicable here through the Fourteenth Amendment) takes place when "some meaningful interference with an individual's possessory interest in . . . property" occurs. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); see *Soldal v. Cook County*, — U.S. —, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). This would not apply to a marginal trespass such as entry into a private yard to rescue an animal in a tree. Here, by contrast, the ASPCA representatives and the New York City firefighters made forced entry, seized and in fact demolished a wall of a private building. Forced entry into and demolition of the outer wall of a private structure is of particular import. The Fourth Amendment specifically refers to the "right of the people to be secure in their . . . houses," a term applicable to houses used as dwellings or for seeking to make a living.

■ The Fourth Amendment grants perhaps the highest level of protection to dwellings.[10] It applies, however, to people's "ef-

---

9. All charges against the plaintiff were dismissed. The Agriculture and Market Law violation was dismissed during October of 1991 for legal insufficiency; the assault and resisting arrest charges were dismissed on January 8, 1992 in the interests of justice. Judge Andrews of the Bronx County Criminal Court found that the prosecutor "failed . . . to state in any way the official or lawful function served by breaking into defendant's premises," that there "was no lawful basis for the arrest," and that the assault may have been justified by provocation. See Plaintiff's Amended Verified Complaint ¶¶ 23–25.

10. During consideration of federal standards for wiretapping and similar investigative techniques, greater protection for dwellings has been seriously proposed in order to minimize the risks foreseen in George Orwell's *1984*. See Committee on Federal Legislation, 7 Reports of Committees of The Ass'n of the Bar of the City of New York Concerned With Federal Legislation No 2 at 1 (1968). Such views are pertinent although never formally adopted, and although subject to being overridden by an adequate showing of need as defined by statute. See, e.g., *United*

fects" as well, and thus applies even to vehicles as well as fixed structures. The realistic and proper expectation of privacy created by the circumstances is crucial to whether a warrant is required or to whether there is an acceptable reason for not seeking one. See *New York v. Class*, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); *United States v. Stevenson*, 803 F.Supp. 825 (S.D.N.Y.1992).

■ A break-in through a fixed wall is drastic action. It justifiably causes a high level of concern to occupants of the premises violated, and to the judiciary and other interpreters of the Constitution.[11] See *Jackson v. Senkowski*, 817 F.Supp. 6 (S.D.N.Y.1993).

## VI

■ Legal authority supports reasonable governmental action to protect non-human species from untoward effects of ill-advised human activity. It has not been established, however, that this permits a municipality—and *a fortiori* a private organization—to exercise or trigger sovereign compulsion to break into private property without even an attempt to contact the owner, or to obtain a warrant by telephone.

■ A warrantless search may be made under the emergency exception "to protect and preserve life," *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963), but the search must be limited by the emergency that necessitated it. *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d

290 (1978). The exception would not apply where ability to seek a warrant at least by telephone existed and no such attempt was made. Six hours transpired between the firefighters' initial rescue efforts and the later joint effort by the firefighters and ASPCA officers, this was not a situation that required an immediate warrantless entry. Having failed to take the opportunity to seek a neutral judicial evaluation of the situation the defendants cannot justify their actions by relying on the emergency exception to the warrant requirement of the Fourth Amendment.

Real immediacy may allow emergency entries to preserve animal life that is threatened because of cruelty,[12] but its application to situations such as that presented here, where the animal had gotten into difficulty on its own without human misconduct and where demolition was required, has yet to be determined.

■ One of the purposes of the Fourth Amendment's guarantee against unreasonable (and warrantless) searches and seizures without warrants is to insert the neutral judgment of an impartial magistrate between potentially overzealous enforcement authorities and the citizen.[13]

The necessity to invoke the warrant procedure where practicable, and where substantial invasion of private rights is involved, was ignored here without any showing of justification.

---

*States v. Mongelli*, 799 F.Supp. 21 (S.D.N.Y. 1992).

**11.** Based on the Supremacy Clause of the Constitution, Article VI, clause 2, the duty to obey constitutional requirements to the best of one's ability applies to the entire public sector at federal, state and local levels.

It is an abdication of responsibility if administrative and other public sector personnel who make crucial decisions on the spot leave application of established constitutional principles of to judicial enforcement alone. See A. Bickel, *The Least Dangerous Branch* (1962); Note, 90 Harv. L.Rev. 1682 (1977).

The duty of the courts to apply the Constitution in case of conflict as laid down in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) flows from the Supremacy Clause and their duty to determine litigation, not from exclu-

sivity of their obligation to apply known core principles set forth in the foundation document of the Republic.

**12.** New York State law prohibits cruelty to animals. See, e.g., Agric. & Markets L. § 353. Peace officers may lawfully intervene to prevent an act of cruelty to an animal if it is done in their presence. Agric. & Markets Law § 371. See also *State v. Bauer*, 127 Wis.2d 401, 409, 379 N.W.2d 895 (Ct.App.1985); *Tuck v. United States*, 477 A.2d 1115 (D.C.Ct.App.1984).

**13.** For this reason, the very fact that a warrant is issued and implemented in good faith may save the fruits of some otherwise vulnerable searches or seizures from suppression under the judicially-created exclusionary rule adopted as a remedy to encourage compliance with the Amendment. See *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984).

## VII

■ The ASPCA, an incorporated not-for-profit corporation, was created 125 years ago by the New York State Legislature; its purpose is to enforce New York laws that protect animals. ASPCA officers are peace officers under N.Y.C.P.L. § 2.10(7). They have powers greater than those of ordinary citizens to make warrantless arrests (compare N.Y.C.P.L. § 140.25 with § 140.30) and searches and to use physical force in making arrests (compare N.Y.Penal Law § 35.10(1) with § 35.10(4)). The ASPCA cannot be recognized as a neutral body, because it represents specific views and is not administered by persons chosen directly or indirectly by elected officials.[14]

In Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), the Court held that the Emergency Price Control Act of 1942 did not involve an unconstitutional delegation of legislative power to the Price Administrator, but indicated that delegation of governmental power to private individuals violated due process. Id. at 424, 64 S.Ct. at 667.

In the instant case, the statute purports to delegate state power to a private corporation, the ASPCA. The problem presented was recognized by the New York Supreme Court, Appellate Division in 1923:

> [The] ... chief objection is that the corporations [the ASPCA] are private in the sense that they proceed from the voluntary action of individual citizens alone ... [and] that the agents or officers of the corporation are appointed such by the corporations and that if such agents are invested

by virtue of their agency alone with the power of public officers it is in substance devolving the choice of public officers on few of the citizens ... while under the [State] Constitution all public officers must be elected or appointed by other public authorities and thus trace their title to power and authority either immediately or [indirectly] back to the people....

*ASPCA v. City of New York,* 205 A.D. 335, 199 N.Y.S. 728 (1923).

The Court went on to hold that a private corporation could perform a purely administrative function for the public sector. 205 A.D. at 341, 199 N.Y.S. 728.[15]

■ For an interested party to make decisions utilizing governmental authority is anathema to due process. See *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Commonwealth Coatings v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).[16]

■ Partiality is forbidden in exercise of sovereign authority even where a private prosecutor is appointed to pursue a contempt charge. See *Young v. United States ex rel. Vuitton et Fils, SA,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). Partiality in making individualized decisions triggering sovereign compulsion squarely confronts due process principles. This is so even where correction of biased actions is possible, for

---

14. "The individual petitioners are members of the ASPCA ... and are activists in the animal rights movement." *ASPCA v. Board of Tr. of the State Un. of N.Y.,* 165 A.D.2d 561, 568 N.Y.S.2d 631, 633 (1991); see *Syquia v. Board of Educ. of the Harpursville Cen. School Dist.,* 80 N.Y.2d 531, 591 N.Y.S.2d 996, 606 N.E.2d 1387 (1992) (New York Court of Appeals overturned school board action for appearance of impropriety by the overcompensation of one member of the board of review).

15. Combinations of prosecutorial and judicial functions even where confined to the public sector itself raise significant questions of both fairness and reliability of decisionmaking, which may be taken into account when the actions

taken are reviewed. See *FTC v. Elders Grain, Inc.,* 868 F.2d 901, 905 (7th Cir.1989).

16. The concept that those exercising decision-making authority as to sovereign compulsion should not also have a stake in the outcome dates back to the Great Charter of King John of 1215 (Magna Carta), quoted in S. Thorne, W. Dunham, P. Kurland & I. Jennings, *The Great Charter* (1965), Chapter 24 of which states that "No sheriff, constable, coroners, or others of our bailiffs, shall hold pleas of the Crown."

See also *Wileman & Bros. v. Giannini,* 909 F.2d 332 (9th Cir.1990); Note, "State Courts and Delegation of Public Authority to Private Groups," 67 Harv.L.Rev. 1398 (1954).

example by payment of compensation for takings.[17]

■ Where delegation of governmental functions to private entities occurs, the nature of the function involved is crucial. Contracts for work to be done for the public sector are traditionally utilized for carrying out ministerial or mechanical functions and for performing noncoercive services, but not for decisionmaking involving coercive exercise of sovereign power. Such decisionmaking is inherently suspect. A warrantless search directed by a non-neutral private party is an event with many strikes against it whether analyzed under the due process clause alone, or under that clause as a trigger for Fourth Amendment considerations.

The risks of abuse of power by private parties exercising functions involving exercise of sovereign compulsion is one reason for the limitations imposed by federal law on use of volunteers in implementing public sector programs. For example, 31 U.S.C. § 1342 provides that an "officer or employee of the United States Government or of the District of Columbia government may not accept voluntary services for either government or employ personal services exceeding that authorized by law except for emergencies ..." Volunteer work is encouraged only under specific statutes not entailing exercise of sovereign compulsion over others. See, e.g., 42 U.S.C. § 4951.[18] The limitation in federal law on the scope to be given to volunteers is based in part on the unsatisfactory history of the conduct of private parties delegated to exercise coercive governmental authority during earlier periods, including the conduct of private detective agency personnel as deputy police officers in the nineteenth century. See, e.g., W. Browne, *Altgeld of Illinois* ch. VIII–XIV (1924) (describing role of private agents selected by the railroads, deputized to

exercise public sector authority during railway strike of 1894).

The ASPCA operates under a City contract. The terms and implementation of that contract require further factual development before reaching ultimate decision in this action. There is a danger that the contract may create a relationship that is too tenuous, and too far removed from the democratic process, to justify a grant to ASPCA officers of powers of search and arrest that exceed those of ordinary citizens.

## VIII

In *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality is a "person" within the meaning of § 1983. The Court also held that the municipality can be liable only when "execution of a government's policy or custom ... inflicts the injury ..." *id.* at 694, 98 S.Ct. at 2037–38, and cannot be liable under a respondeat superior theory. *Id.* at 691, 98 S.Ct. at 2036.

■ Municipal liability under 42 U.S.C. § 1983 may be predicated upon a finding that policymakers have acted unconstitutionally. See *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Even if no one individual policymaker is sufficiently culpable to be personally liable, misconduct or absence of necessary action by those at the policy level may support municipal liability. See *Allen v. City of Yonkers*, 803 F.Supp. 679 (S.D.N.Y. 1992).

---

17. See *Lucas v. South Carolina Coastal Council*, — U.S. —, 112 S.Ct. 2935, 119 L.Ed.2d 561 (1992); Trevaskis, "Measure of Damages for Regulatory Takings," 3 Probate & Property 17 (ABA Mar./Apr. 1989).

18. Use of so-called "dollar a year" personnel even in noncoercive managerial and advisory capacities was controversial even during the Second World War because of potential for undue influence in directions favored by such person-

nel. See D. McCullough, *Truman* 255, 278–280 (1992); Fleischmann, "The Mobilization Program and the Public Interest," 100 U.Pa.L.Rev. 494 (1952); McAleer, "Dollar-a-Year and Without Compensation Personnel Policies of the War Production Board and Predecessor Agencies, August 1939 through November 1945," Special Study No. 27, *Historical Reports on War Administration* (Civilian Production Admin.1947).

■ Ordinarily, a single incident by non-policy making actors is not enough to demonstrate municipal policy, *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Ricciuti v. NYC Transit Authority*, 941 F.2d 119, 123 (2d Cir.1991). But lack of adequate training or supervision may itself reflect a municipal policy, and may be proved by circumstantial evidence. 941 F.2d at 123. This is not the first time that private New York peace officers have exceeded granted authority; interactions of the ASPCA with the general public have been found to be problematic in other cases.[19]

■ While New York State requires training of peace officers, N.Y.Criminal Procedure Law ("CPL") § 2.30 (McKinney 1993), the statute does not specify the nature of that training. Where public sector functions are delegated to private parties even within otherwise proper limits, supervision is required under New York law. See *People v. Mobil Oil Co.*, 101 Misc.2d 882, 885–887, 422 N.Y.S.2d 589 (1979).

■ I cannot evaluate the merits of the current motion with respect to municipal liability[20] until the ASPCA and the City produce evidence, including training manuals, that would indicate how the firefighters and ASPCA officers are actually trained in the emergency rescue of animals and in adherence to Fourth Amendment requirements, and to what extent they are trained in building demolition where no fire is involved.

■ Similarly, the degree to which the individual defendants may or may not have acted with deliberate disregard of plaintiff's federal constitutional rights, or may have acted in good faith in such a way as to benefit from qualified immunity, cannot be assessed on the present record and decision in these areas must await either a subsequent motion for summary judgment supported by more detailed information, or trial on the merits.

## IX

■ Plaintiff must establish injury and standing to proceed with this litigation. Defendants have raised substantial questions as to whether plaintiff is entitled to any relief even if the Fourth Amendment was violated here. I conclude that plaintiff has sufficient standing to proceed with this suit at least at the present juncture, because violation of the Fourth Amendment itself may entail some damage whether significant monetarily or not, and because of the possibility that injunctive relief may be appropriate.

■ One choosing to utilize a corporation to operate a business cannot, absent special circumstances, disregard the corporate veil and obtain damages personally for harm to the corporation. See generally *United States for Use of R.I.M. Plumbing v. Freedom Plumbing & Heating*, 802 F.Supp. 1013 (S.D.N.Y.1992). The issue of what rights if any the corporation possessing the space broken into may have is considered in Part XI.

Plaintiff, arriving at the scene after the premises involved were already broken into, knowing that those involved were municipal personnel and peace officers, and having begun to wield a metal pipe, may himself have been the proximate cause of any injury resulting from his arrest and other events subsequent to his grasping of the weapon. He may thus be unable successfully to claim damages for such injury.

It may also be appropriate to view the entire incident as a single episode in which both the officially authorized personnel and the plaintiff who arrived later and wielded a metal pipe acted improperly. Splitting a sequence of events into components treated as separate compartments may lead one to miss the overall picture. See *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). If

---

19. See e.g. *Bradshaw v. Silversmith*, 122 Misc.2d 544, 472 N.Y.S.2d 237 (1983); *County of Albany v. American Soc., Etc.*, 112 Misc.2d 829, 447 N.Y.S.2d 662 (Sup.Ct.1982); *People v. Smith*, 125 Misc.2d 782, 480 N.Y.S.2d 443 (N.Y.C.Crim.Ct. 1984).

20. The Supreme Court has recently ruled that there is no "heightened pleading requirement" for 42 U.S.C. § 1983 cases. *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

one avoids "disaggregation"[21] of the events which occurred and regards them as a single whole, the improper conduct of the opposing sides in this case may balance, making more than a nominal monetary award to either inappropriate.

██ Arriving on the scene after the initial break-in and being the first one to initiate violence, plaintiff cannot claim to have acted in self-defense as might an occupant of a home or business premises confronting an intruder. See *Jackson v. Senkowski,* 817 F.Supp. 6 (S.D.N.Y.1993).

One committing, or initiating an attempt to commit, an illegal act as a prime mover rather than merely acquiescing in it, may inherently be *in pari delicto* and therefore be disqualified from recovery of any significant monetary award. See *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). While an involuntary participant is not barred from recovery by being involved in wrongdoing, *Isaksen v. Vermont Castings,* 825 F.2d 1158 (7th Cir.1987), plaintiff does not fit this category.

While a party initiating the use of violence (other than in self-defense of person or premises) may through his own aggressiveness have forfeited the opportunity to obtain a monetary award based on anything occurring in connection with the incident, injunctive relief may still be available. See *General Leaseways v. National Truck Leasing Ass'n,* 744 F.2d 588 (7th Cir.1984). Likewise, nominal damages may be awarded where an important legal guarantee has been infringed. See *General Leaseways,* ruling on damages, 830 F.2d 716 (7th Cir.1987). In part for these reasons a party *in pari delicto* may, regardless of ability to recover significant monetary damages, retain standing to sue. See *Volvo North America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55 (2d Cir.1988).[22]

Even if a party is unable to show any significant financially defined loss or is barred from recovering for such loss because he was *in pari delicto* in regard to the incident as a whole, nominal damages sufficient to support standing may be found if a Fourth Amendment violation is shown. Fourth Amendment standing of a party injured by an illegal government-authorized break-in has special importance. See generally *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Such a violation affects a natural person individually in light of presence on the scene and duties in connection with management of the space broken into. As indicated in *Memphis Community School District v. Stachura,* 477 U.S. 299, 310–11, 106 S.Ct. 2537, 2545, 91 L.Ed.2d 249 (1986), when "a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may be appropriate." This is sufficient to support standing of the plaintiff to sue in this case even if significant amounts cannot be recovered.[23]

---

**21.** See Tushnet, "Book Review," 82 Colum.L.Rev. 1531 (1982).

**22.** In seeking damages for psychological consequences of the incident, plaintiff faces, in addition to the above questions, the additional hurdle of showing that any mental condition created by the incident was not already present or incipient at the moment when he reacted to the intrusion by grasping a weapon and moving toward its actual or threatened use. Whether compensation for nonquantifiable psychological damage is recoverable in a Fourth Amendment case of this kind is a further question which need not be resolved at this juncture.

**23.** Fourth Amendment standing can protect innocent victims of illegal searches or seizures who cannot take advantage of a motion to exclude any evidence obtained in connection with the violation, see Fed.R.Crim.P. 41.

Moreover, damage claims and injunctive relief furnish an alternative to the exclusionary rule in certain situations. See 28 U.S.C. § 2680(h) permitting federal agency liability for some types of Fourth Amendment violations; *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); Foote, "Tort Remedies for Police Violations of Individual Rights," 39 Minn.L.Rev. 493 (1955); Gellhorn & Schenck, "Tort Actions against the Federal Government," 47 Colum.L.Rev. 722 (1947).

This may have additional significance because long-standing dissatisfaction with the problematic nature of exclusion of reliable evidence as a means of deterring official misconduct has led to restrictions on application of the rule, e.g. where good faith reliance on a search warrant is involved. See *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) (application of exclusionary

*Memphis v. Stachura, supra* held that the abstract generalized importance of any constitutional right violated is not relevant to calculation of damages. This does not, however, bar plaintiff from proceeding in this court. There is no monetary minimum jurisdictional amount under 42 U.S.C. § 1983, under 28 U.S.C. § 1331, the general federal question jurisdictional provision, or under the specific civil rights jurisdictional provision, 28 U.S.C. § 1343. This is not a case of standing claimed on some generalized and thus highly diluted basis, such as that of taxpayers. See *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

Further, plaintiff may seek injunctive relief if a significant risk of repetition of illegal behavior exists. Such relief could, if justified, extend beyond prohibiting specifically illegal conduct and call for prophylactic measures to avoid such conduct in the future. See *Rufo v. Inmates of the Suffolk County Jail,* — U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

X

Since the issue of qualified immunity is not adequately presented by the present motion as filed, nor has adequate factual development with respect to it occurred, I have granted leave for it to be raised by a separate motion absent prior settlement of this case. Accordingly, it may be useful to indicate here some issues which should be dealt with by the parties in any submissions on that subject.

First, plaintiff should indicate what basis exists for inferring that the individual defendants not merely violated Fourth Amendment and due process guarantees, but should have known that they were doing so and hence acted intentionally or recklessly. See *O'Neill v. Town of Babylon,* 986 F.2d 646 (2d Cir.1993).

In attempting to make this showing, plaintiff must reckon with the potential significance of Public Law 100–694. Public Law

100–694, 102 Stat.4563, enacting 28 U.S.C. § 2679(b), the Federal Employees Liability Reform and Tort Compensation Act, is known as the *Westfall* Act because it modified the result in *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), which had permitted suits by federal employees against supervisors for negligence under state tort law, notwithstanding the existence of workers compensation protection.

The House committee report on the *Westfall* Act, H.Rep. 700, 100th Cong., 2d Sess. (1988), 1988 U.S.Code Cong. & Admin.News ("USCAN") 5945, indicates that "possible exposure of Federal employees to personal liability could lead to a substantial diminution in the vigor of Federal law enforcement and implementation." 1988 USCAN at 5947.

While the *Westfall* Act is not directly applicable to state or local officials, the objectives underlying it suggest particular caution in exposing individuals, as contrasted with institutional entities, to trials involving claims for monetary damages, regardless of the level of government involved. It may thus be persuasive although not directly binding here. See *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 773, 65 S.Ct. 1515, 1522, 89 L.Ed. 1915 (1945); *Parker v. Brown,* 317 U.S. 341, 367, 63 S.Ct. 307, 321–22, 87 L.Ed. 315 (1943); *Zendman v. Harry Winston, Inc.,* 305 N.Y. 180, 189 n. 3, 111 N.E.2d 871 (1953); Stone, *The Common Law in the United States,* 50 Harv.L.Rev. 4, 12–18 (1936); Note, *The Legitimacy of Civil Law Reasoning in the Common Law: Justice Harlan's Contribution,* 82 Yale L.J. 258 (1972).

Such a concern is enhanced by *Westfall* itself as announced prior to the *Westfall* Act. In *Westfall* the Supreme Court ruled that if any discretion was involved in an activity, immunity would protect individual federal employees from monetary damage suits. While the facts in *Westfall* concerned a damage suit based on state law, nothing in the opinion indicated that its protection of discre-

rule not retroactive because deterrence of future misconduct is sole objective of rule); Committee on Criminal Law, Federal Bar Ass'n of New York, New Jersey & Connecticut [now Federal Bar Council], "New Approaches to Enforcement

of the Fourth Amendment," 3 Crim.L.Bull. No 9 at 630 (Nov. 1967); Note, 89 Mich.L.Rev. 624 (Dec. 1990); Note, 16 Fordham Urb.L.J. No 4 at 577 (1988).

tionary decisions from monetary suits was so limited.[24]

Second, counsel for the ASPCA may wish to address the question of whether qualified immunity can apply to a private organization, private peace officers, both or neither, and whether such parties should have known that use of private power to effect warrantless searches under the circumstances involved here was foreseeably unconstitutional.

Third, since qualified immunity is limited to damage claims, the parties may wish to deal with whether claims for legal fees may be made against a party not liable for money damages, should equitable relief against that party be granted. See *Pulliam v. Allen*, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984).

### XI

Plaintiff has moved to amend the complaint pursuant to Fed.R.Civ.P. 15 to add as an additional plaintiff the corporation which owned the facility broken into. I grant that application, but direct plaintiff to deal with the following questions in any such amendment or in an accompanying memorandum:

First, does the conduct of the current plaintiff Suss at the site of the incident bar the corporation, on behalf of which Suss presumably was acting, from obtaining damages or can it be asserted as a setoff to any such damages?

Second, does the corporation's claim, if such is made, for damages for injury to its property amount to an assertion that its property was taken for public use? If so, is the corporation required to pursue such a takings claim pursuant to the New York Eminent Domain Procedure Law, only presenting the matter to this court if no state remedy is available? See generally *Lichtler v. County of Orange*, 813 F.Supp. 1054 (S.D.N.Y.1993); Trevaskis, "Measure of Damages in Regulatory Takings," 3 Probate

& Property No 2 at 17 (ABA Mar/April 1989).

Third, can any damages be obtained by a corporation for violation of the Fourth Amendment apart from property damage?

### XII

Serious efforts to settle this case may be appropriate. Frequently parties to litigation, with their greater knowledge of the circumstances, are able to fashion a resolution superior to any that could be imposed by the court. In this instance, all parties have significant reasons to consider a consensual resolution.

Although I do not undertake to make any findings of fact in connection with the present motion for summary judgment pursuant to Fed.R.Civ.P. 56, it is clear from the undisputed facts that there is at least a substantial possibility that a Fourth Amendment violation may have occurred. It is also evident that such a violation may have resulted from the possible failure of the ASPCA and the City to provide adequate safeguards against exercise of sovereign compulsion where triggered by a private organization in ways leading to seizures in situations not constituting an emergency of a nature which would preclude efforts to obtain a warrant.

Ample resources are available in this great metropolitan area for the institutional parties before me to obtain advice from persons of diverse background and training to develop means of preventing cruelty to animals while minimizing abrasive contact with the public and reducing risks of overpassing traditional constitutional limitations long considered crucial to our liberties. Use of such resources may lead to development of procedures which the court in the exercise of prudence would not order, see *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), but which might be of benefit to all of the interests involved.

---

24. One reason for the development of monetary claims against state and local officials may be the nontextual interpretation of the Eleventh Amendment as creating state sovereign immunity, see Gibbons, "The Eleventh Amendment and State Sovereignty: A Reinterpretation," 83 Co-lum.L.Rev. 1889 (1983), leading to use of individual suits as an alternate avenue for enforcement of the Fourteenth Amendment, following *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

Both the individual plaintiff and the potential corporate plaintiff here face significant barriers to obtaining monetary relief, some of which are suggested in this memorandum order, and may or may not be able to show significant risk of repetition of the violations alleged here so as to qualify for injunctive protection. See *Women's Equity Action League v. Cavazos*, 906 F.2d 742 (D.C.Cir. 1990) (R. Ginsburg, J.) and the earlier decision in 879 F.2d 880 (D.C.Cir.1989).

The monetary aspects of this case may well not support the expense of extensive further litigation. This requires me to consider appropriate steps which the court can properly take pursuant to the obligation of case management imposed by the Judicial Improvements Act of 1990, Public Law 101–650, 104 Stat. 5089, enacting 28 U.S.C. § 473; see also Fed.R.Civ.P. 1.

Should the parties fail to resolve this litigation among themselves and wish to call on the good offices of this court in connection with settlement efforts, they should contact my chambers. If appropriate, the presence of principals may be required as indicated in *G. Heileman Brewing Co. v. Joseph Oat Co.*, 871 F.2d 648 (7th Cir.1989).

**SO ORDERED.**