ALEXANDER FISHER et al., Appellants, v ALEXANDER BIDERMAN, as Commissioner of the Department of Housing Preservation and Development of the City of New York, et al., Respondents.

First Department, March 8, 1990

156

## APPEARANCES OF COUNSEL

*Richard M. Zuckerman* of counsel *(Jarblum, Solomon & Fornari, P. C.,* attorneys), for appellants.

*Fred Kolikoff* of counsel *(Leonard Koerner* and *Michael Barron* with him on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for respondents.

### OPINION OF THE COURT

KUPFERMAN, J. P.

Plaintiffs seek, as citizen taxpayers, injunctive relief and a declaratory judgment declaring that certain contracts under which the city would indemnify a repair and maintenance contractor for its own negligence and the negligence of its

employees and agents in connection with the repair and maintenance of city owned and/or managed buildings, violate General Obligations Law §§ 5-322.1 and 5-323.

Since 1978, the Department of Housing Preservation and Development (HPD) has managed the city's portfolio of housing acquired through in rem proceedings as the result of the owner's default in payment of the applicable property taxes. The number of buildings so held is constantly in flux as additional owners default on their taxes and various buildings are sold or otherwise disposed of by the city. As of October 1988, HPD was directly managing more than 37,000 units of housing in approximately 3,600 occupied buildings.

In order to provide necessary services to the residents of these buildings, the city has contracted with a private company selected through annual public bidding to provide HPD's requirements for superintendents and handymen for these buildings.

In the past, the contracts for personnel management and payroll services for superintendents and handymen had required the contractor to maintain specified levels of insurance against liability for personal injury and property damage, the cost of such coverage being paid for by the city as a "compensable cost" to the contractor. When an analysis of the handymen's contract indicated that the city could save at least $3 million a year by eliminating the requirement that the contractor provide liability insurance, HPD decided to act as a self-insurer by removing that requirement from both contracts and, instead, indemnifying the contractor from losses that otherwise would have been covered by insurance.

Thus, in 1988, the city entered into separate contracts with Gotham Building Maintenance Corp. whereby Gotham was to provide personnel management and payroll services for superintendents and handymen working in buildings managed by HPD for periods ending September 30, 1989 with an option for HPD to renew the contract for up to an additional 12 months.

While both contracts require that Gotham maintain specified levels of liability insurance, they further provide that "[a]t HPD's request and upon the consent of the Contractor, the insurance required * * * shall be terminated and on such date the indemnification set forth in Article 21 shall be in full force and effect."

Article 21 of each of the contracts provides:

"21.1 The City shall indemnify and hold Contractor harm-

less from any loss, cost, liability, claim, damage expense, judgment, penalty or fine incurred in connection with or arising from any injury to Contractor, its employees, agents, or any other person during the performance of this Agreement, or for any damage to, or loss of, any of the City's property, the Contractor's Property, or the property of any other person, irrespective of the cause of injury, damage or loss (including without limitation, negligent acts of Contractor, its employees and agents but not including intentional wrongdoing) arising during the performance of this Agreement.

"21.2 Contractor shall cooperate with the City in the defense of any lawsuit, which defense shall be conducted by the City solely at the City's expense (including any dispersements *[sic]* and expenses for attorneys, if any). This indemnification shall survive the expiration of this Agreement."

Plaintiff Alexander Fisher is chairman of coplaintiff Amalgamated Programs Corp. which has been the broker for certain general liability and property insurance policies required to be maintained by the contractor in the contracts covering periods up to and including September 30, 1988. Both plaintiffs claim, in the verified complaint, that they are citizens of the State within the meaning of State Finance Law § 123-a in that they both pay State income and sales taxes. However, presumably, in light of the city's statement that no State funds would be disbursed in connection with the contracts and no State officer or employee would be involved in the disbursement of funds under the contracts, the parties, as noted by the IAS court, both argued as to the applicability of General Municipal Law § 51, which authorizes a taxpayer action to prevent any illegal official act on the part of municipal officers or to prevent waste of municipal funds.

In its brief, the city contends that plaintiffs do not have standing pursuant to either State Finance Law § 123-b, which applies only to proceedings which challenge the actions of a State officer or employee or the expenditure of State funds *(see, Weimer v Board of Educ.,* 52 NY2d 148, 152, n 2) or General Municipal Law § 51.* With regard to General Municipal Law § 51, it is contended that there is no allegation that

---

* In a postargument letter, counsel advises us that if we agree that plaintiffs do not have standing but, nevertheless, reach the merits, as requested by the city, it would agree to be bound by this court's decision on the merits to the same degree as it would be bound if plaintiffs did have standing.

the corporate plaintiff pays real property taxes to the city and that although the individual plaintiff owns shares in a residential cooperative corporation and contributes toward the corporation's tax liability, section 51 gives him the right to bring an action only where the action is brought to prevent injury to property owned by him or the co-op (citing *Matter of Washburn v Goldin,* 59 AD2d 682). However, that decision was legislatively overruled by the 1981 amendment of section 51 (L 1981, ch 614), which gives owners of shares of a cooperative, whose pro rata share of real estate taxes is $1,000 or more annually, the same right as fee owners to maintain a taxpayer action. Contrary to the city's contention, a reading of that amendment makes it clear that such right is not limited to situations where the municipal action might cause injury to the co-op property. Thus, the individual plaintiff appears to have general standing to maintain this action based upon his status as a co-op owner whose pro rata share of real estate taxes is at least $1,000.

Both parties err in inferring that the IAS court found that plaintiffs lack standing. In fact, the court did not discuss standing under section 51. Contrary to the inferences drawn by the parties from the court's decision, a failure to establish such fraud or illegality does not go to plaintiffs' standing, but rather the sufficiency of their cause of action. The issue then is whether the municipal acts complained of are fraudulent or a waste of public property, within the meaning of section 51.

As the IAS court (141 Misc 2d 804) correctly found, it has repeatedly been held that mere illegality is insufficient to establish the right to institute a taxpayer suit. As stated by the Court of Appeals in *Mesivta of Forest Hills Inst. v City of New York* (58 NY2d 1014, 1016): "It is well established that a taxpayer action pursuant to section 51 of the General Municipal Law lies 'only when the acts complained of are fraudulent, or a waste of public property in the sense that they represent a use of public property or funds for entirely illegal purposes' *(Kaskel v Impellitteri,* 306 NY 73, 79; see *Gaynor v Rockefeller,* 15 NY2d 120, 133-134; *Stahl Soap Corp. v City of New York,* 5 NY2d 200, 204; *Talcott v City of Buffalo,* 125 NY 280, 288)."

This court, in *Starburst Realty Corp. v City of New York* (125 AD2d 148, *lv denied* 70 NY2d 605), recognized that the courts have repeatedly held that the law is not a vehicle for correcting technical or procedural irregularities by governmental bodies and that the Court of Appeals in *Mesivta*

*(supra)* took the position that a taxpayer's suit is not available simply to review a determination supposedly made in violation of law. As noted by Justice Milonas, in writing for a unanimous court, "to make a taxpayer's suit available to challenge * * * actions such as the one before us here could severely impede the conduct of public business." (125 AD2d, at 155.) Moreover, he stated, any question regarding the legality of the governmental action (in that case the award of cable television franchises) can properly and expeditiously be resolved by means of a CPLR article 78 proceeding *(supra,* at 155).

In that case, since the litigation was commenced long after the Statute of Limitations applicable to article 78 proceedings, the court declined to convert the action into such a proceeding pursuant to CPLR 103 (c). Here, however, the present action is timely and, therefore, the IAS court properly addressed the merits and issued a declaration of rights.

Moreover, an apt analogous illustration of standing can be found in the recent case of *Matter of Har Enters. v Town of Brookhaven* (74 NY2d 524, 529), wherein the ipso facto harm to a property owner was held to be a basis for permitting a challenge to the agency's compliance with SEQRA.

As to plaintiffs' contention that the indemnification clauses in issue fall squarely within the prohibitions of the General Obligations Law, the municipal defendants concede that the subject contracts are within the literal language of General Obligations Law §§ 5-322.1 and 5-323, but argue that the Legislature never intended the statutory provisions to apply to indemnifications intended to benefit the city as real property owner, not the contractor, by replacing city-financed insurance. The city further points out that the complained-of indemnification clauses will not affect the ability of injured third parties to recover against the city for their injuries and, since the city controls the work of the contractor in these instances, there will be no impact on the quality of work performed.

The General Obligations Law sections in issue provide, in pertinent part:

"§ 5-322.1. Agreements exempting owners and contractors from liability for negligence void and unenforceable; certain cases

"1. A covenant, promise, agreement or understanding in, or in connection with or collateral to a contract or agreement

relative to the construction, alteration, repair or maintenance of a building, structure appurtenances and appliances including moving, demolition and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property contributed to, caused by or resulting from the negligence of the promisee, his agents or employees, or indemnitee, whether such negligence be in whole or in part, is against public policy and is void and unenforceable; provided that this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by an admitted insurer. This subdivision shall not preclude a promisee requiring indemnification for damages arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of a party other than the promisee, whether or not the promisee is partially negligent."

"§ 5-323. Agreements exempting building service or maintenance contractors from liability for negligence void and unenforceable

"Every covenant, agreement or understanding in or in connection with or collateral to any contract or agreement affecting real property made or entered into, whereby or whereunder a contractor exempts himself from liability for injuries to person or property caused by or resulting from the negligence of such contractor, his agent, servants or employees, as a result of work performed or services rendered in connection with the construction, maintenance and repair of real property or its appurtenances, shall be deemed to be void as against public policy and wholly unenforceable."

It has been long recognized that, in construing a statute, the courts must first ascertain and then effectuate its legislative purpose (see, Rankin v Shanker, 23 NY2d 111, 112; Matter of Astman v Kelly, 2 NY2d 567, 572; McKinney's Cons Laws of NY, Book 1, Statutes § 111).

As reflected in the legislative memorandum in support of section 5-322.1, which is included in the record, the purpose of the section is to invalidate, as against public policy, the then prevalent practice in the construction industry of causing contractors and subcontractors to assume liability for the negligence of others by contract, thus requiring them to pay prohibitive insurance premiums, which, in addition to precluding small contractors from performance on projects for which

they were otherwise qualified, dramatically affected construction costs. In amending the section in 1981 to eliminate certain loopholes in the original law, the memorandum in support stated that the justification for what has been called the "Broad Form Hold Harmless Law" is that one should not be held to answer for the wrongful acts of another unless he is in the insurance business, assuming risks in return for payment of premiums.

Nothing in such legislative history appears to support the invalidation of the indemnification provisions of the contracts in issue and the few cases on point tend to support the city's action.

In *Failla v A.F.A. Protective Sys.* (139 AD2d 693), a landowner's broad indemnification of a contractor was upheld as a contractual provision by which the landowner became, in effect, the contractor's insurer against liability to third parties. Similarly, in *Board of Educ. v Valden Assocs.* (46 NY2d 653), a construction contract required the owner to provide fire and other liability insurance for the project and provided that the owner, contractor and all subcontractors waived all rights against each other for damages caused by perils covered by the insurance. After a loss occurred, the insurer paid the owner and sought subrogation against the contractor and subcontractors. When the defendants asserted the waiver provisions of the contract as a defense, the plaintiff contended that such provisions were unenforceable pursuant to section 5-323 of the General Obligations Law. In rejecting such argument, the Court of Appeals found that: "A distinction must be drawn between contractual provisions which seek to exempt a party from liability to persons who have been injured or whose property has been damaged and contractual provisions, such as those involved in this suit, which in effect simply require one of the parties to the contract to provide insurance for all of the parties. Absent any indication of overreaching or unconscionability, such provisions violate neither section 5-323 of the General Obligations Law nor any other public policy (see *Hogeland v Sibley, Lindsay & Curr Co.*, 42 NY2d 153)." *(Supra, at 657.)*

The same rationale would seem to apply in this situation where the city has elected to become a self-insurer as it has in most others *(see, e.g., Matter of State Farm Mut. Auto. Ins. Co. v Amato*, 72 NY2d 288). Such choice appears to be a valid business decision by the city and the courts should not interfere with it absent a clear violation of law.

Accordingly, the judgment of the Supreme Court, New York County (Edward H. Lehner, J.), entered January 10, 1989, should be affirmed, without costs.

MILONAS, KASSAL and ELLERIN, JJ., concur.

Judgment, Supreme Court, New York County, entered on January 10, 1989, unanimously affirmed, without costs and without disbursements.