Robert **KESSLER** and Vicki **Cheikes,** Plaintiffs,

v.

**GRAND CENTRAL DISTRICT MANAGEMENT ASSOCIATION, INC.,** Defendant,

and

**The City of New York,** Intervenor–Defendant,

and

**The State of New York and Dennis Vacco, Attorney General,** Intervenor–Defendant.

No. 95 Civ. 10029 (SAS).

United States District Court, S.D. New York.

March 27, 1997.

Robert Solomon, David Kennedy, J.D. Candidate, Jerome N. Frank Legal Services Organization, Yale Law School, New Haven, CT, Douglas Lasdon, Patrick Horvath, Urban Justice Center, New York City, for Plaintiffs.

R. Hewitt Pate, Sarah C. Johnson, Hunton & Williams, Richmond, VA, Myron D. Cohen, Hunton & Williams, New York, New York, for Defendant GCDMA.

Robin Binder, Gabriel Taussig, Assistant Corporation Counsels, Corporation Counsel of the City of New York, New York, New York, for Intervenor–Defendant The City of New York.

Charles F. Sanders, Constantine A. Speres, Assistant Attorneys General, Attorney General of the State of New York, New York, New York, for Intervenor–Defendant State of New York.

### OPINION AND ORDER

SCHEINDLIN, District Judge:

## I. INTRODUCTION

Plaintiffs Robert Kessler and Vicki Cheikes ("Plaintiffs"), residents of the Grand Central Business Improvement District ("GC BID" or "District"), commenced this action pursuant to 42 U.S.C. § 1983. Plaintiffs allege that the disproportionate representation of property owners on the Board of Directors ("the Board") of Defendant Grand Central District Management Association ("GCDMA"), as required by the GCDMA Bylaws, N.Y. Gen. Mun. Law ("GML") § 980–m(b), and the New York City Administrative Code ("Admin.Code") § 25–414(b), violates the principle of one-person, one-vote mandated by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In response, Defendant claims that Plaintiffs lack standing to bring this action and that the equal protection issue is not ripe for adjudication. In addition, Defendant and Intervenor–Defendants contend that the voting scheme of the GCDMA falls within the "special limited purpose" doctrine of the Equal Protection Clause, and therefore does not violate the principle of one-person, one-vote.

Plaintiffs now move for summary judgment pursuant to Fed.R.Civ.P. 56. Defendant and Intervenor–Defendants The City of New York ("the City") and The State of New York ("the State") cross-move for summary

judgment. After careful review, I conclude that Plaintiffs have standing to raise their equal protection claim because they are most appropriately viewed as tenants for purposes of the GC BID Board voting scheme. Defendant's contention that this claim is not ripe for adjudication is also rejected. Finally, because of GCDMA's special limited purpose and the disproportionate effect of its activities on property owners, the election of the Board is not subject to the strict one-person, one-vote demands of the Equal Protection Clause. Consequently, Plaintiffs' motion for summary judgment is denied, and Defendant's and Intervenor–Defendants' motions are granted.

## II. BACKGROUND

Plaintiffs live in cooperative apartments within the GC BID. Joint Stipulation of Facts ("Joint Stip.") ¶¶ 9, 10. They own shares in the cooperative corporation which holds fee title to the building in which their apartments are located, id. ¶ 11, and occupy their apartments pursuant to a proprietary lease with the cooperative corporation. See By-laws of 372 Fifth Ave. Owners, Inc., art. V. Their building became part of the GC BID as a result of an expansion of the BID that occurred in 1995.[1]

### A. The Nature of BIDs

The legislative history of GML § 980, although sparse, indicates that the New York legislature established BIDs in response to deteriorating conditions in business districts throughout many municipalities in the state. See Business Improvement District Act, ch. 282, § 2, 1989 N.Y. Sess. Law Serv. The legislature found that these conditions adversely affected the economic as well as the "general well-being of the people of the state," and that BIDs would be an "effective means for restoring and promoting business activity" through the various services they would provide. Id. GCDMA asserts that the purpose of BIDs is to "provide an innovative mechanism by which business owners can improve the environment in which they oper-

ate." GCDMA's Memorandum of Law in Support of its Cross–Motion for Summary Judgment ("GCDMA's Memo") at 3. GML §§ 980 to 980–p and the Admin. Code §§ 25–401 to 25–417 provide statutory authority for the establishment and operation of BIDs in New York City.

A BID is a geographically defined area of a city, town or village, in which property owners pay an assessment to fund (1) services that supplement services provided by the municipality, such as sanitation or social services, and (2) capital improvements, such as landscaping. These supplemental services and capital improvements aim to "restore or promote business activity in the district." GML § 980–c.

The formation of a BID commences with the preparation of a district plan, the contents of which are dictated by state law. Id. § 980–a. The plan must include, inter alia, a map of the district, a description of the present and proposed uses of the land within the district, budgetary information, and the methods by which the expenses of the district will be imposed upon real property. Id. Once prepared, a district plan for a BID is subject to public review. See id. § 980–d. Throughout this process, the district plan is reviewed by community boards, the City Planning Commission, and finally the City Council. See id. § 980–d(c). Public hearings are also held. Id. §§ 980–d, 980–e. The capital improvements and supplemental services a BID provides are financed by assessments charged against benefited real property located in the district. Id. § 980–j(a).

### B. The GC BID

#### 1. GCDMA and The Grand Central Partnership

GCDMA operates the GC BID, the boundaries of which currently extend from 35th Street to 54th Street and from Second Avenue to Fifth Avenue in the Borough of Manhattan. Joint Stip. ¶ 6. In 1995, the GC BID expanded to include the area immediately North of Grand Central Terminal, and other

---

1. The district plan that created the GC BID (described more fully below) was amended on June 6, 1995, pursuant to GML § 980–i and Admin.

Code § 25–410. That amendment expanded the boundaries of the GC BID to include Plaintiffs' building. See Joint Stip. ¶¶ 6, 14, Ex. P.

areas. *Id.* The GC BID contains approximately 71 million square feet of commercial space, which constitutes approximately 19% of Manhattan's total office space, and approximately 897,000 square feet of residential space. *Id.* ¶ 7. The Grand Central Partnership ("GCP") is the operating entity of the GC BID, that carries out the day-to-day functions of GCDMA pursuant to an agreement between GCP and GCDMA. *See id.* Ex. K.

### 2. Services Provided by GCDMA[2]

As a general matter, it should be noted that "[i]t is required by law that the services provided by GCDMA will be in addition to or in enhancement of those provided by the City of New York prior to the establishment of the District." *Id.* ¶ 42. The services provided by GCDMA are not meant to substitute for those provided by the City, *id.*, Ex. P at 15, but rather are supplemental to those the City provides.[3] The GCDMA has the authority to enter into contracts for several services provided by the GCP, which, as mentioned above, is the entity that carries out the day-to-day functions of GCDMA. *Id.* ¶¶ 4, 34.

#### i. Security

GCP maintains a security staff of approximately 63 officers. *Id.* ¶ 23. The primary function of the security staff is to supplement services provided by the New York City Police Department ("NYPD"). *Id.*, Ex. P at 9. Specifically, the GCP security staff, in "cooperation with the NYPD, ... patrol[s] the streets and sidewalks of the District so as to reduce the incidence of serious crime." *Id.* at 10. In addition, GCP security staff, in "cooperation with [the] NYPD and the building staff of private property-owners, ... maintain[s] the quality of life in the District

by attempting to obtain compliance with city regulations controlling vending, sidewalk obstructions, noise generation, and air pollution from mobile sources." *Id.* Security provided by GCP does not replace police services provided by the City or the State. Members of the GCP security staff are either licensed security guards or peace officers.[4] All members of the GCP security staff are unarmed, except for licensed supervisors. *Id.* ¶ 1 24. The reason that GCDMA provides security services is that "office rents, retail business, and hotel occupancy ... are all affected by the perception of crime in [the] area," which obviously relates to improving business in the District. *Id.*, Ex. P at 9.

#### ii. Sanitation

GCP employs approximately 38 sanitation workers to clean streets and sidewalks, wash street signs, paint fire hydrants, and remove graffiti in the District. *Id.* ¶¶ 26–30, Ex. P at 10. These workers also bag trash for municipal pickup by the Department of Sanitation. *Id.* ¶ 27. The sanitation services provided by GCP are supplemental to those provided by the Department of Sanitation. GCDMA's goal, articulated when the GC BID was first established, was to make the District's streets and sidewalks the cleanest of any commercial district in New York City. *Id.*, Ex. G at 13. The GC BID has been successful in its efforts, receiving the City's highest ratings in 1994. *Id.*, Ex. P at 10.

#### iii. Physical Improvements

Some of the physical improvements GCP has made in the District include the installation of wheelchair ramps, planters, trees, and barrier-free corners that provide easy access on and off sidewalks for people in wheelchairs. *Id.* ¶¶ 20–22. Although GCP can

---

**2.** GCDMA does not operate any school systems, court systems, or administrative tribunals, nor does it prosecute crimes, maintain jails, provide fire services, license motor vehicles, license vendors, operate public libraries, record deeds, have enforcement authority over consumer protection, environmental protection, traffic laws, or animal control. *Id.* ¶¶ 43–53.

**3.** This fact is clear from the overlap of some of the services GCDMA and the City provide. *Id.*,

Ex. P at 9. The City continues to provide police, sanitation, transit, traffic regulation, and social services in the District, even though GCDMA also provides certain security, sanitation, and social services. *Id.*

**4.** *See* N.Y.Crim. Proc. Law § 2.10 (persons designated as peace officers); N.Y.Crim. Proc. Law § 2.20 (powers of peace officers).

make physical improvements in the district, it must obtain approval from the relevant City agencies before any changes can be made. *Id.* ¶ 19.

#### iv. Retail Improvements

Another method by which GCDMA seeks to promote and improve business in the District is through the provision of various services that enhance the appearance of the stores in the District. GCP provides assistance to businesses in the District that seek to make the facades of their retail sites more attractive. *Id.* ¶¶ 36, 37. GCDMA also employs "the services of a retail designer, a leasing specialist, and a zoning and enforcement specialist to work with retailers to improve their visual impact on the [D]istrict and to ensure that their presentation complies with applicable City code provisions." *Id.*, Ex. P at 11. In addition, GCP has installed two shoe shine stands in the District, located just outside of Grand Central Station. *Id.* ¶ 35.

#### v. Social Services

GCP itself, or through the Grand Central Neighborhood Social Services Corporation ("GCNSSC"), provides various social services to the homeless in the District, including outreach services, drop-in centers, and job training. *Id.* ¶¶ 31–33. The predominate concern of GCDMA, in providing social services, is to help the business environment in the District, although these services also serve the purpose of helping the homeless. *Id.*, Ex. G at 15.

#### vi. Tourist Orientation

GCP operates tourist information services, which provide multilingual information to tourists in the District. *Id.* ¶ 38. GCP operates booths and carts located throughout the District, which provide tourists with information about hotels, museums, parks, concert halls, and transportation in the District. *Id.*,

Exs. G at 15; P at 10. The tourist services promote area businesses. *Id.*, Ex. P at 10.

#### vii. Public Events and Promotion

GCP has sponsored public events and promotions in the District. The purpose of these public events and promotions is to alter the flow of pedestrian traffic in the District in order to improve security and increase retail traffic. *Id.*, Ex. G at 15. These events and promotions are meant to help attract people into the District, and enhance the perception of the District as a lively and attractive area. *Id.*, Ex. P at 11.

#### 3. Funding for the GCDMA

Funding for GCDMA and the services it renders derives from a special assessment levied on all benefited property within the District.[5] *Id.* ¶ 66. All industrial, commercial, and residential property is subject to the assessment on the same basis. *Id.* ¶ 68. The City of New York, through the Department of Finance, levies, collects, and sets the rate of the special assessment. *Id.* ¶ 66; GML § 980-j(b). The amount of the special assessment is based on the square footage of the property. Joint Stip., Ex. P at 16. Bills for the special assessment are directed to the owners of record of property located in the District. *Id.* ¶ 73.

GCDMA can also obtain funding through the issuance of bonds and by taking out loans. The bonds are issued by GCDMA, but must be approved by the City of New York. *Id.* ¶ 77. The City must also give its approval before GCDMA can take out a loan. *Id.*, Ex. P at 17. Moreover, if the City does not want a BID to issue bonds or take out a loan it has the power and authority to prevent the BID from doing so.[6] GCDMA's Reply Memo., Ex. A.

#### 4. Voting for the Board of GCDMA

The GCDMA is governed by the Board, which is made up of representatives of five

---

5. Only property owned by not-for-profit corporations and public purpose property is exempt from assessment. *Id.* ¶ 67.

6. In September 1995, the Giuliani administration prohibited BIDs from issuing any more bonds or

from taking out loans. GCDMA's Reply Memorandum in Support of Its Cross–Motion for Summary Judgment ("GCDMA Reply Memo."), Ex. A.

different classes: (1) Class A members, who are owners of record of real property located in the District; (2) Class B members, who are tenants not eligible for Class A membership, and who are occupants pursuant to leases of commercial space; (3) Class C members, who are tenants not eligible for Class A or B membership, who are occupants pursuant to leases of dwelling units within the District; (4) Class D members, who are political representatives, including one person appointed by the Mayor, the Comptroller of the City, the Borough President of Manhattan, and the Majority Leader of the City Council; and (5) Class E members, who include any interested parties who are not eligible for Class A, B, C or D membership. At the time this suit was filed Class A had 31 representatives on the Board, Class B had 16, Class C had 1, Class D had 4, and Class E had none. Joint Stip., Ex. C. Each of the Classes, except for E, has voting rights. *Id.,* Ex. A.

The Board is elected pursuant to its Bylaws, the Admin. Code, and the GML. All require that the a majority of the Board members represent property owners (Class A members). This requirement remains constant despite the fact that residential tenants (Class C members) currently outnumber property owners (Class A members) in the District. All Classes are represented on the Board by at least one representative. The votes of property owners are weighed in proportion to the assessment levied against their property. GML § 980–m(a). The total number of votes assigned to any one member, however, cannot exceed one-third of the total votes which may be cast. *Id.*

### D. The Present Motion

Plaintiffs argue that as a matter of law, property owners' disproportionate Board representation as required by the GCDMA Bylaws, as well as state and local law, violates the principle of one-person, one-vote under the Equal Protection Clause.[7] In response, Defendant and Intervenor–Defen-

dants argue that Plaintiffs, as property owners, do not have standing to challenge the voting scheme by which the Board is elected because that scheme advantages rather than disadvantages property owners. They also argue that this matter is not ripe for adjudication. On the merits, Defendant and Intervenor–Defendants claim that the voting scheme of the GCDMA falls within the "special limited purpose" doctrine of the Equal Protection Clause, and therefore does not violate the principle of one-person, one-vote. They also claim that they are entitled to judgment as a matter of law.

### III. DISCUSSION

#### A. Standing

▮ The threshold issue in this action is whether Plaintiffs have standing to raise their Equal Protection claim. The burden falls on Plaintiffs to allege facts to demonstrate that they have standing. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). It is not sufficient for Plaintiffs to allege "a generalized grievance against allegedly illegal government conduct." *United States v. Hays,* 515 U.S. 737, ——, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995). "The rule against generalized grievances applies with as much force in the equal protection context as in any other." *Id.* Rather, the "irreducible constitutional minimum of standing" requires that Plaintiffs prove three separate elements. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). First, they must show that they have suffered "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Hays,* 515 U.S. at ——, 115 S.Ct. at 2435. Second, there must be a causal connection between the Defendant's and Intervenor–Defendants' conduct and the injury Plaintiffs claim to have suffered. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136. Third, Plaintiffs

---

7. Whether GCDMA is a state actor for purposes of the Equal Protection Clause is not a disputed issue in this case. Although GCDMA is a private entity, state law provides for its establishment and operation, and GCDMA operates pursuant to

its contract with the City. *See, e.g. Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Suss v. ASPCA,* 823 F.Supp. 181 (S.D.N.Y.1993).

must show that "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. at 2136.

█ Plaintiffs claim that they have standing because they are residential tenants within the BID and, as such, are prohibited from electing a majority of the members of GCDMA's Board of Directors. *See* Joint Stip., Ex. I ¶ 1; GML § 980–m(b); Admin. Code § 25–414(b). As tenants, Plaintiffs would have standing to claim (1) that they have been injured by this limitation on their ability to elect BID directors; (2) that their injury has been caused by the provisions of the BID Bylaws and the New York City and State laws mandating this limitation; and (3) that their injury could be redressed by a court decision invalidating these provisions.

Defendant argues that Plaintiffs are property owners because they are shareholders of their cooperative, which owns Plaintiffs' apartment building. Joint Stip. ¶ 11. As property owners, Plaintiffs would be Class A members of GCDMA entitled to elect a majority of GCDMA's Board, *see id.*, Ex. I ¶ 1, and would have no standing to sue because property owners are advantaged, rather than injured, by the provisions at issue. *See, e.g., Hays,* 515 U.S. at ——, 115 S.Ct. at 2437 ("Only those citizens able to allege injury 'as a direct result of having *personally* been denied equal treatment' [may challenge a discriminatory voting scheme].") (Emphasis added) (quoting *Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984)).

Whether tenant-shareholders of a cooperative apartment are considered tenants or landowners in this context has not been considered by the New York state courts. The New York Court of Appeals has noted that the

> ownership interest of a tenant-shareholder in a co-operative apartment is sui generis. It reflects only an ownership of a proprietary lease, and therefore arguably an interest in a chattel real, conditional however upon [the tenant-shareholder's] interest in the co-operative corporation, an interest always treated as personal property.... For some purposes it is a lease; for others it is a compact between co-operative corporation and co-operative tenant.

*State Tax Comm'n v. Shor,* 43 N.Y.2d 151, 154–56, 400 N.Y.S.2d 805, 371 N.E.2d 523 (1977).

Courts have found that tenant-shareholders of cooperative apartments are not real·property owners in a number of circumstances,[8] but are property owners in other situations.[9] To determine Plaintiffs' status in this case, the Court must "assess[ ] on a case-by-case basis which aspect of this paradoxical

---

8. *See, e.g., Superior Fin. Corp. v. Haskell,* 556 F.Supp. 199 (S.D.N.Y.1983) (cooperative shares are personalty for the purpose of the Uniform Commercial Code); *Shor,* 43 N.Y.2d 151, 400 N.Y.S.2d 805, 371 N.E.2d 523 (cooperative shares are personalty for the purpose of creating a lien against them); *Washburn v. Goldin,* 59 A.D.2d 682, 398 N.Y.S.2d 665 (1st Dep't 1977) (tenant-shareholders are not real property owners for the purpose of a law granting property owners a cause of action to challenge illegal acts by government officials) *recognized as overruled by change of statute in Fisher v. Biderman,* 154 A.D.2d 155, 552 N.Y.S.2d 221 (1st Dep't 1990); *Wall Street Transcript Corp. v. Finch Apartment Corp.,* 148 Misc.2d 181, 559 N.Y.S.2d 920, 922 (Civ.Ct.N.Y.City 1990) ("cooperative shareholders [are] tenants in relation to the co-operative corporation" for the purpose of a tenant's suit to remove dangerous conditions); *Southridge Cooperative Section No. 3, Inc. v. Menendez,* 141 Misc.2d 823, 535 N.Y.S.2d 299, 301 (Civ.Ct. Queens Co.1988) ("it has been abundantly recognized in law that ... [a] proprietary lease entered into by a stockholder of a cooperative corporation is in fact a lease by a tenant for residential rental premises" for the purpose of a law prohibiting certain restrictions on tenancies); *McMunn v. Steppingstone Management Corp.,* 131 Misc.2d 340, 500 N.Y.S.2d 219 (Civ.Ct.N.Y.City 1986) (owner of a cooperative apartment is the cooperative corporation, not the shareholder, for the purpose of the war·ranty of habitability).

9. *See, e.g., In re Estate of Carmer,* 71 N.Y.2d 781, 530 N.Y.S.2d 88, 525 N.E.2d 734 (cooperative shares are realty for the purpose of interpreting a will which bequeathed stock to some heirs and real property to others); *Baranello v. 700 Shore Road Waters Edge, Inc.,* 159 Misc.2d 1040, 607 N.Y.S.2d 584 (Sup.Ct. Nassau Co.1993) (cooperative shares are realty for the purpose of the automatic stay provisions of N.Y. C.P.L.R. 5519); *see also United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (cooperative shares are not securities covered by federal securities laws).

interest predominates." *In re Estate of Carmer*, 71 N.Y.2d 781, 785, 530 N.Y.S.2d 88, 525 N.E.2d 734 (1988). *See also Fe Bland v. Two Trees Management Co.*, 66 N.Y.2d 556, 563, 498 N.Y.S.2d 336, 489 N.E.2d 223 (1985) ("The relationship between the shareholder/lessees of a cooperative corporation and the corporation is determined by the certificate of incorporation, the corporation's by-laws and the proprietary lease ... subject ... to applicable statutory and decisional law.").

In this case, it is most appropriate to view Plaintiffs as residential tenants rather than property owners. New York courts appear to agree that tenant-shareholders have the rights of tenants vis-á-vis the cooperative corporation. *See, e.g., Washburn*, 59 A.D.2d 682, 398 N.Y.S.2d 665; *Wall Street Transcript Corp.*, 148 Misc.2d 181, 559 N.Y.S.2d 920; *Southridge Cooperative*, 141 Misc.2d 823, 535 N.Y.S.2d 299; *McMunn*, 131 Misc.2d 340, 500 N.Y.S.2d 219. Thus tenant-shareholders have standing to advance interests as tenants that may differ from those of the cooperative corporation (and thus from their own interests as shareholders). This view is most clearly supported by *Washburn*, where the Appellate Division refused to treat tenant-shareholders as property owners for the purpose of a law allowing property owners to challenge illegal acts by government officials, recognizing that the cooperative corporation, not its shareholders, was the real property owner. *See* 398 N.Y.S.2d at 666. This view is also consistent with the fundamental principle of corporate law that a corporation and its shareholders are distinct and separate legal entities.[10]

Classifying Plaintiffs as tenants rather than property owners is also consistent with the activities of each of the parties. BID assessments are based on the "gross building square footage on a given assessable property" rather than on the size of individual tenants' apartments. Joint Stip., Ex. P at 16. The City bills Plaintiffs' cooperative corporation for the BID assessments rather than billing Plaintiffs directly. *Id.* ¶¶ 71–73. Finally, the cooperative corporation, rather than the building's tenants, decides how to allocate the assessment among the cooperative's shareholders. *Id.* ¶¶ 74–75. These facts combine to show that Plaintiffs, Defendant, and Intervenor–Defendants have treated Plaintiffs' cooperative corporation, but not Plaintiffs, as a real property owner for the purposes of the BID.

As tenants, Plaintiffs have standing to claim they were injured by the denial of an equal voice in the operation of the GCDMA based on the property restriction on GCDMA board membership. *See Quinn v. Millsap*, 491 U.S. 95, 103, 109 S.Ct. 2324, 2329–30, 105 L.Ed.2d 74 (1989) ("a person who does not own real property has Article III standing to challenge... a state-law requirement that one own real property in order to serve on a particular government board"). That Plaintiffs, as tenants, do not pay the assessment directly does not affect their standing. As residents of the district, they have standing to advance their claim that they have been denied an equal voice in its operation. *See, e.g., Ball v. James*, 451 U.S. 355, 370, 101 S.Ct. 1811, 1820–21, 68 L.Ed.2d 150 (1981) (suit brought by tenants and non-voting landowners where "[t]he voting landowners [were] the only residents of the District whose lands [were] subject to liens to secure District bonds ... or to acreage-based taxing ... [or who had ever] committed capital ... through stock assessments"); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 731, 93 S.Ct. 1224, 1231, 35 L.Ed.2d 659 (1973) ("assessments against landowners were. the sole means by which expenses of the district were ... paid," yet some plaintiffs were non-landowners); *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 208, 90 S.Ct. 1990, 1993, 26 L.Ed.2d 523 (1970) (challenge to property-qualification for voting

---

**10.** *See, e.g., Powers v. Ostreicher*, 824 F.Supp. 372, 378 (S.D.N.Y.1993) (shareholder does not have an individual cause of action for injuries to the corporation); *Franklin Elec. Publishers, Inc. v. Unisonic Prods. Corp.*, 763 F.Supp. 1, 3 (S.D.N.Y.1991) ("the separate identity of a corporation should be recognized and upheld unless specific unusual circumstances allow for an exception"); *Harris v. Stony Clove Lake Acres Inc.*, 202 A.D.2d 745, 608 N.Y.S.2d 584, 586 (3d Dep't 1994) ("A corporation, even when wholly owned by a single individual, has a separate legal existence from its shareholders.").

on bond issues brought by non-landowner where the law "require[d] that property taxes be levied in an amount sufficient to service the ... bonds"); *Kramer v. Union Free Sch. Dist. No.* 15, 395 U.S. 621, 625, 89 S.Ct. 1886, 1888, 23 L.Ed.2d 583 (1969) (challenge to property-qualification for voting for school board brought by plaintiff who "ha[d] no children and neither own[ed] nor lease[d] taxable real property" where local school funding was provided through a real property tax).

As Plaintiffs have alleged facts demonstrating both that they have suffered an injury because of Defendant's and Intervenor–Defendants' conduct, and that it is likely that the injury would be redressed by a favorable decision, they have standing to bring this suit.

### B. Ripeness

■■■ Defendant also argues that this suit is not ripe for decision because Plaintiffs have never attempted to challenge the voting restrictions by attempting to gain a majority of the seats on the GCDMA board. To be ripe, a dispute must be "definite and concrete" rather than "hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). The purpose of the ripeness doctrine is to "prevent[ ] the courts ... from entangling themselves in abstract disagreements [and to] prevent[ ] the premature adjudication of issues that may never arise." *Motor Vehicle Mfrs. Ass'n of the United States v. New York State Dep't of Envtl. Conservation,* 79 F.3d 1298, 1305 (2d Cir.1996). In determining whether a suit is ripe for adjudication, a court must consider "the fitness of the issues for adjudication and the hardship to the parties that would result from withholding review." *Id.*

The voting scheme of which Plaintiffs complain is clearly stated in the GCDMA Bylaws and in New York City and New York State law. *See* Joint Stip., Ex. I ¶ 1; GML § 980–m(b); Admin. Code § 25–414(b). It is undisputed that these provisions treat tenants and property owners differently as a matter of law for the purpose of electing GCDMA directors. Thus, there is no need for further

development of the factual record. *See, e.g., Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (finding issue justiciable when it was "a purely legal one" the resolution of which did not require findings of fact); *Dietary Supplemental Coalition, Inc. v. Sullivan,* 978 F.2d 560, 562 (9th Cir.1992) ("The fitness element requires that the issue be primarily legal [and] need no further factual development"); *Armstrong World Indus., Inc. ex rel. Wolfson v. Adams,* 961 F.2d 405, 412 (3d Cir. 1992) ("a factual record is not as important where the question presented is 'predominantly legal' ") (quoting *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983)). This issue, therefore, is fit for adjudication.

Plaintiffs must also show that the harm they have suffered is real rather than potential. In *Renne v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991), upon which Defendant relies, the United States Supreme Court rejected a challenge by a political party to a provision of the California State Constitution which prohibited political parties from endorsing candidates for non-partisan positions because the plaintiffs had neither challenged the provisions nor shown an intention to engage in the prohibited activity and because the provisions had never been enforced against political parties. *Id.* at 321–23, 111 S.Ct. at 2338–40. This case is distinguishable from *Geary.*

In *Geary,* it was not clear to the Court how, if at all, the challenged provisions would be applied to the plaintiff. *Id.* at 321–22, 111 S.Ct. at 2338–39. The plaintiff in *Geary* could not show that the existence of the restriction on partisan endorsements had ever deterred it from making endorsements. *Id.* Furthermore, when plaintiff had made endorsements in violation of the restrictions, the law had never been enforced against it, nor had plaintiff shown that the State intended to enforce the restrictions against political parties in the future. *Id.* Finally, in a subsequent case, the Court has cited *Geary* as standing for the proposition that "a facial challenge should generally not be entertained when an 'as-applied' challenge could resolve

the case." *Colorado Republican Fed. Campaign Comm. v. FEC,* —— U.S. ——, ——, 116 S.Ct. 2309, 2320, 135 L.Ed.2d 795 (1996). Here, Defendant does not contest Plaintiffs' assertion that the challenged provisions would be applied to deny residential tenants within the BID an equal voice in the operation of the GCDMA.[11]

The instant case, however, is strikingly similar to a post-*Geary* Second Circuit case which rejected a ripeness challenge. In *Williams v. Lambert,* 46 F.3d 1275 (2d Cir. 1995), plaintiff challenged a state law which forbade the modification of certain support agreements, even though she had not attempted to have her support agreement modified notwithstanding the provisions of the statute. *Id.* at 1277–78, 1280. The court found that such a gesture "would be a futile one, as [plaintiff's] case would be dismissed summarily under the clear language" of the statute being challenged. *Id.* at 1280. Similarly, any attempt by Plaintiffs to elect a majority of the BID's directors would fail under the "clear language" of the BID By-laws and New York City and State law.

Because any attempt by tenants to gain a majority of the seats on the GCDMA board is doomed to failure, the court "will not require ... a futile gesture as a prerequisite for adjudication in federal court." *Williams,* 46 F.3d at 1280. *See also International Bhd. of Teamsters v. United States,* 431 U.S. 324, 365–68, 97 S.Ct. 1843, 1869–71, 52 L.Ed.2d 396 (1977) (plaintiff has standing under Title VII if, in the face of overt discrimination in hiring, he does not apply for a job "solely because of his unwillingness to engage in a futile gesture"); *Buckley v. Valeo,* 424 U.S. 1, 117, 96 S.Ct. 612, 681, 46 L.Ed.2d 659 (1976) (challenge to statute's constitutionality ripe even though an administrative agency had not yet issued all implementing rules and regulations); *Lake Carriers' Ass'n v. Mac-Mullan,* 406 U.S. 498, 507–08, 92 S.Ct. 1749, 1755–56, 32 L.Ed.2d 257 (1972) (case is ripe when enforcement of the law is inevitable). For the reasons stated above, this controversy is ripe for adjudication.

### C. Equal Protection Clause

#### 1. Legal Standard for Summary Judgment

Under Fed. R.Civ. P. 56(c), summary judgment shall be granted to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden of demonstrating that no factual dispute exists rests on the party seeking summary judgment. *See Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). Here, the parties have stipulated to the relevant facts for the purposes of these cross-motions.

#### 2. One-Person, One–Vote

Plaintiffs claim that the voting scheme for electing members to the Board violates the Equal Protection Clause because as tenants, they are not represented on the Board in proportion to their number, which is inconsistent with the principle of one-person, one-vote. Defendants argue that because GCDMA serves a special limited purpose that disproportionately affects property owners within the BID, one-person, one-vote does not apply.

In a city as large and diverse as New York, it is apparent that individual communities have vastly different needs. The creation of BIDs represents a state and local legislative effort to address that inevitable diversity. The Supreme Court has acknowledged "the necessity of permitting experimentation with political structures to meet the often novel problems confronting local communities." *Ball,* 451 U.S. at 373, 101 S.Ct. at 1822 (Powell, J., concurring). The special limited purpose doctrine responds to that necessity, and, in essence, permits a governmental subdivision, such as a BID, to

---

**11.** Given the clear provisions of the GCDMA Bylaws and the New York City and State laws in question, the Defendant and Intervenor–Defendants would be hard-pressed to credibly make such an assertion.

operate free of the strictures of one-person, one-vote. This doctrine is necessarily limited, however, so that the exception does not swallow the rule. The doctrine is a pragmatic one: where a government entity serves a limited purpose, the functions of which disproportionately affect a particular group, that group is permitted to exercise control over the entity's functions. If either of these practical considerations—special limited purpose or disproportionate effect—is not present, the doctrine does not apply, and the entity must comply with one-person, one-vote to avoid running afoul of constitutional guarantees.

A review of Supreme Court jurisprudence in this area is instructive. In the seminal case of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Court held that apportionment of state government representation must be done on the basis of population. Three years later, in *Avery v. Midland County,* 390 U.S. 474, 479, 88 S.Ct. 1114, 1117–18, 20 L.Ed.2d 45 (1967), the Court extended the rule of *Reynolds* to the governing body of a county, stating that "[t]he Equal Protection Clause reaches the exercise of state power however manifested, whether exercised by the State or a political subdivision." *See also Board of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989); *Kramer,* 395 U.S. at 628, 89 S.Ct. at 1890; *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Simply put, the Constitution demands that "States ... insure that each person's vote counts as much, insofar as it is practicable, as any other person's." *Hadley v. Junior College Dist.,* 397 U.S. 50, 54, 90 S.Ct. 791, 794, 25 L.Ed.2d 45 (1970).

■ The strictures of one-person, one-vote do not apply to a governmental body that has a special limited purpose and performs activities that have a disproportionate effect on a definable group of constituents. *See Salyer,* 410 U.S. at 728, 93 S.Ct. at 1229–30; *Ball,* 451 U.S. at 370, 101 S.Ct. at 1820–21; *Associated Enters., Inc. v. Toltec Watershed Imp. Dist.,* 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973). Whether a governmental body must adhere to one-person, one-vote depends upon whether it exercises " 'general govern-

mental powers' and 'perform[s] important governmental functions,' that ha[ve] significant effect on all citizens residing in the district." *Ball,* 451 U.S. at 363, 101 S.Ct. at 1817 (quoting *Hadley,* 397 U.S. at 53–54, 90 S.Ct. at 793–94). This is a factual determination. If the governmental body performs general government functions, and these functions have a significant effect on all citizens residing in the area, the strict demands of one-person, one-vote will apply because such a body is not a limited purpose governmental body. *See Hadley,* 397 U.S. at 53–54, 90 S.Ct. at 793–94 (one-person, one-vote applies to the election of junior college district trustees because they had general governmental powers and performed important governmental functions that had significant effect on all citizens residing within the district). If, however, the governmental body has a special limited purpose, the court must then determine whether the activities performed by this body have a disproportionate effect on a definable group of constituents such that the principle of one-person, one-vote does not apply. If so, as a final step, the voting restrictions at issue must pass rational relationship scrutiny. *See Salyer,* 410 U.S. at 730–31, 93 S.Ct. at 1230–31. Under that test, a court must determine if "any state of facts reasonably may be conceived to justify" the denial of the franchise to tenants versus property owners. *See id.* at 731–32, 93 S.Ct. at 1231–32 (quoting *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)).

Since *Reynolds,* the Supreme Court has considered the one-person, one-vote principle in several contexts. For example, in *Hadley,* residents of the Kansas School District, one of eight school districts that made up the Junior College District, claimed that their right to vote for trustees of the Junior College District was unconstitutionally diluted in violation of the Equal Protection Clause. 397 U.S. at 51, 90 S.Ct. at 792. The residents argued that while they represented 60% of the eligible voters, the apportionment plan only enabled them to vote for three trustee, or 50% of the total number of trustees. *Id.*

772

The functions performed by the Junior College trustees in *Hadley* were levying and collecting taxes, issuing bonds, hiring and firing teachers, making contracts, collecting fees, supervising and disciplining students, passing on petitions to annex school districts, acquiring property by condemnation, and managing the operations of the junior college. *Id.* at 53, 90 S.Ct. at 793–94. In holding that the powers performed by the trustees were "general enough" and had a "sufficient impact throughout the district" to justify the application of one-person, one-vote, the Court stated that "[e]ducation has traditionally been a vital governmental function." *Id.* at 54, 90 S.Ct. at 794.

In *Salyer*, residents of the Tulare Lake Basin Water Storage District challenged the constitutionality of a statutory scheme for electing directors to the board of the district. The residents claimed that the statute, which limited voting rights to landowners,[12] violated the Equal Protection Clause. The district was authorized to plan and execute approved projects for the "acquisition, appropriation, diversion, storage, conservation, and distribution of water." 410 U.S. at 723, 93 S.Ct. at 1227. The district was also permitted to generate and sell any form of power it saw fit to support its water operations, although the district never chose to do so. *Id.* at 723–24, 93 S.Ct. at 1227–28. The board had the power to hire and fire employees for the district projects, to enter into contracts for the construction of projects, and to condemn private property for use in such projects. *Id.* at 728 n. 7, 93 S.Ct. at 1230 n. 7. The costs of the various projects were assessed against each landowner according to the benefits they received. *Id.* at 724, 93 S.Ct. at 1227–28. The board also had the authority to issue bonds in order to fund projects. *Id.* at 728 n. 7, 93 S.Ct. at 1230 n. 7.

The Court held that the water storage district, "by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group," fell within the exception, rather than the rule, of *Reynolds*, and therefore that the principle of one-person, one-vote did not apply. *Id.* at 728, 93 S.Ct. at 1229–30. The Court reasoned that although the district was "vested with some typical government powers, [it] had relatively limited authority," while the primary reason for the district's existence was to "provide for the acquisition, storage, and distribution of water."[13] *Id.* Consistent with that reasoning, the Court found that the district provided no general public services such as "schools, housing, transportation, utilities, [or] roads." *Id.* at 729, 93 S.Ct. at 1230.

In *Ball*, the constitutionality of the voting scheme for electing directors to the board of a water district was again challenged. The primary purpose of the district was "the storage, delivery, and conservation of water." 451 U.S. at 357, 101 S.Ct. at 1814. The district also supplied electric power to hundreds of thousands of people, making it one of the largest suppliers of such power in Arizona. *Id.* at 355, 365, 101 S.Ct. at 1812–13, 1818. The district was run by a board of directors. Only landowners were permitted to vote for members of the board. *Id.* at 355, 101 S.Ct. at 1812–13. Under the statutory scheme, voting was apportioned among landowners according to the number of acres they owned. *Id.* The district was able to raise money through an acreage-proportionate taxing power, and through bonds secured by liens on the real property in the district. *Id.* However, most of the costs of the district were "met through revenues generated by the selling of electric power." *Id.* at 365–66, 101 S.Ct. at 1818.

Non-landowning residents of the district as well as some landowners of less than one acre of land claimed that the acreage-based scheme for electing directors violated the Equal Protection Clause. *Id.* at 360, 101 S.Ct. at 1815–16. The Court, however, held that the district "simply did not exercise the sort of governmental powers that invoke the

12. Voting power was apportioned according to the assessed valuation of the voting landowner's property. *Salyer*, 410 U.S. at 725, 93 S.Ct. at 1228.

13. The Court found the district's power to hire and fire workers, contract for construction of projects, condemn private property, and issue bonds, were some typical governmental functions. *Id.* at 728 & n. 7, 93 S.Ct. at 1230 & n. 7.

strict demands of *Reynolds,*" and that the district's functions had a disproportionate impact on property owners. *Id.* at 366, 371, 101 S.Ct. at 1818, 1821. The Court found it significant that the district could not impose property taxes, enact laws governing the conduct of citizens, nor "administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." *Id.* at 366, 101 S.Ct. at 1818 (footnote omitted). The Court reasoned that the district's water functions, which were the primary purpose of the district, were "relatively narrow." *Id.* at 367, 101 S.Ct. at 1819. Finally, the Court noted that it was of "no special constitutional significance" that the water district in *Salyer* only affected agricultural land while the water district in *Ball* affected both agricultural and urban land. *Id.*

■ Accordingly, the issue presented in this case is whether GCDMA performs a sufficiently narrow function and whether the special relationship of property owners to this function exempts GCDMA from the one-person, one-vote requirement of the Equal Protection Clause. Plaintiffs argue that one-person, one-vote should apply to GCDMA because it, like the entities in *Hadley* and *Avery,* performs general governmental functions, and that these functions have a significant effect on the citizens living in the District. By contrast, Defendant and Intervenor–Defendants argue that GCDMA is more like the special limited entities in *Salyer* and *Ball.*

### 3. The GCDMA Serves a Special Limited Purpose

First, it must be noted that GCDMA has limited authority over the services it provides. Under both New York State Law and the New York City Code, the City Council supervises and controls GCDMA and its services. *See* GML §§ 980–c, 980–d; Admin. Code §§ 25–404, 25–405. GCDMA must obtain approval of its plan from the City government before it can act.[14] In order to obtain approval, the plan must include a detailed statement of the GCDMA's proposed services. The Mayor of New York may require that the plan be prepared by or under the supervision of city officers and employees. Admin. Code § 25–405(d). Moreover, the Mayor, the Comptroller of the City of New York, the Borough President of Manhattan, and the Majority Leader of the City Council may each appoint a member to the Board, and each of these appointees have voting rights. Thus, like the district in *Salyer,* while GCDMA might be "vested with some typical government powers, [it] has relatively limited authority." *Salyer,* 410 U.S. at 728, 93 S.Ct. at 1230.

Such a high level of municipal control over the BID is significant, because it means that City officials retain accountability to their constituents within the BID. BID residents unhappy with BID activities can always turn to their elected representatives, who, under the statutory scheme, have not abdicated their responsibilities to the BID Board. This safety net is even more apparent when one considers that four Board members are appointed by and represent the interests of City officials.

The GCDMA also lacks regulatory power. Most significantly, it does not have the power to levy and collect taxes, or to set tax rates.[15] Here, the City of New York, through its Department of Finance, and not GCDMA, levies and collects the special assessment. The Department of Finance also determines the rate of the assessment. GML § 980–j(b). Without the revenue generated by this as-

**14.** The public must also be notified about a proposed plan, and public hearings must be held if the population of the city where the BID is located is greater than one million. *See* GML § 980–d; Admin. Code § 25–404.

**15.** The special purpose entities in *Salyer* and Ball also lacked this power. The Court in Ball stated that the district had an "acreage-proportionate taxing power." 451 U.S. at 360, 101 S.Ct. at 1815–16. Although the Court used the words "taxing power," the district did not have the

power to set the tax rate, and this "taxing power" only applied to landowners. The Court explicitly noted that the district does not have the power to impose "ad valorem property taxes or sales taxes." *Id.* at 366, 101 S.Ct. at 1818. Thus, in effect, the district only had the power to levy and collect assessments from landowners. *See also Pittman v. Board of Educ.,* 64 F.3d 1098, 1102–03 (7th Cir.1995) (Posner, C.J.) (power to tax is an important distinction).

sessment, the GC BID would have no means by which to fund its activities. When an entity such as a BID depends almost entirely on such an assessment, yet by statute lacks any power to fix or collect that assessment, its powers are significantly limited.

That sanitation and security are also municipal functions does not alter the fact that GCDMA's provision of these services merely supplements and does not replace the City's services. Again, this is significant because residents within the BID are not without recourse should they be displeased with the sanitation and security in their area. The primary provider of these services is the City of New York. Residents can still appeal to their elected representatives if the City's provision of sanitation or security is inadequate.

Finally, the functions performed by GCDMA and its Board, although more varied than those in *Salyer* and *Ball*, bear a close relationship to the GC BID's purpose, which is restoring and promoting business activity in the District. *See* Business Improvement District Act, ch. 282, § 2, 1989 N.Y. Sess. Law Serv. Admittedly, GCMDA performs some typical municipal functions, such as sanitation and security. However, these functions are not unrelated to GCDMA's purpose. Cleaner and safer streets, for example, encourage shopping in the District. In addition to sanitation and security, GCP has made physical and retail improvements, operated tourist services, and conducted public events and promotion in the area. *See* Part II.B.2, *supra.* These services also bear a close nexus to the BID's purpose.[16] GCDMA does not, for example, operate a school system, or license motor vehicles—functions that would be too attenuated from restoring and promoting business in the GC BID for

the BID to be considered a special purpose entity. Although social services have perhaps the weakest relationship to improving business within the BID, the number of homeless persons in an area still may have a significant effect on business.

While the question might be a closer one than that presented in *Salyer* and Ball, I nonetheless conclude that the GCDMA serves a special limited purpose. GCDMA's authority is limited by City oversight, its services are merely supplemental, and its activities bear a close relationship to its statutorily defined function. Most importantly, because the GCDMA's authority is limited, residents within the district still have recourse to their own elected officials.

**B. GCDMA's Functions Disproportionately Affect Property Owners**

As an initial matter, for a voting scheme such as this to pass constitutional muster, property owners need not "be the only parties at all affected by the operations of the entity," nor must the property owners' "entire economic well-being [ ] depend on that entity." *Ball,* 451 U.S. at 371, 101 S.Ct. at 1821. Rather, the question is "whether the effect of [GCDMA's] operations on [property owners is] disproportionately greater than the effect on those seeking to vote." *Id.*

As noted above, the GC BID contains about 71 million square feet of commercial space, compared to 897,000 square feet of residential space. *See* Joint Stip. ¶ 6. Zoning is primarily "high density commercial". *Id.,* Ex. P at 4. There are over 200 office buildings, with a variety of retail stores on the ground floor. *Id.* at 4–5. During the week, approximately 250,000 office workers inhabit the area. *Id.* The residential population, based on residential surveys and 1990 census

---

16. By contrast, the Commissioners in *Avery* had the power to make a "large number of decisions having a broad range of impacts on all citizens in the county." *Id.* at 483, 88 S.Ct. at 1119. None of the Commissioners' functions related to a special limited purpose. The Commissioners had the power, *inter alia*, to establish and maintain the county jail, appoint numerous county officials, enter into contracts, build roads and bridges, administer the county welfare system, perform duties in connection with elections, set the county tax rate, issue bonds, adopt a county

budget, build and run hospitals, airports, and libraries, fix school district boundaries, establish a housing authority, and determine the election districts for county commissioners. *Avery,* 390 U.S. at 476–77, 88 S.Ct. at 1115–16. The exercise of these functions precludes a finding that the governmental body in *Avery* had a limited special purpose. Rather, these functions ineluctably lead to the opposite conclusion—that the entity's purpose was to specifically perform general government functions.

multipliers, totals approximately 930 people. *Id.* at 6. Most of those residents live in two high-rise cooperative and condominium towers at the edge of the BID. *Id.* Several low-rise residential buildings are scattered throughout the BID. *Id.*

The primary way in which property owners are disproportionately affected by GCDMA's activities is that they foot the bill for these activities. Residential, commercial, and industrial property owners in the BID, rather than residential or commercial tenants, are subject to the real property assessment levied by the GCDMA. Payment of the assessment is mandatory as a matter of state and local law. Joint Stip. ¶ 70. If a property owner fails to pay the assessment, a lien can be placed on his or her property. Thus, the voting property owners are uniquely subject to a mandatory assessment and lien if they fail to pay the assessment. This clearly has a disproportionate effect on property owners. Moreover, property owners receive a significant benefit from GCDMA's activities, as their property values can only increase as business improves. It is doubtful that property owners would be willing to finance GCDMA's activities if "short-term lessees whose fortunes were not in the long run tied to the [value of the property] were to have a major vote in the affairs of the [D]istrict." *Salyer,* 410 U.S. at 732, 93 S.Ct. at 1232.

Where, as here, one group is "primarily burdened and benefited by the establishment and operation of" a special district, the State "may condition the vote accordingly." *Associated Enterprises,* 410 U.S. at 745, 93 S.Ct. at 1238. *See also Ball,* 451 U.S. at 364 n. 8, 101 S.Ct. at 1818 n. 8; *Kramer,* 395 U.S. at 627, 89 S.Ct. at 1889–90. Similarly, based upon these facts, the State could "rationally make the weight of [property owners'] votes dependant upon the [square footage] they own, since that number reasonably reflects the relative risk they incurred as [property owners] and the distribution of the benefits and the burdens of the [BID's services]." *Ball,* 451 U.S. at 371, 101 S.Ct. at 1821 (footnote omitted).

**C. The GC BID's Voting Scheme Has a Reasonable Relationship to the Purpose of the GC BID**

Because the voting scheme is not subject to the one-person, one-vote requirement, it need only be reasonably related to the purpose of the GC BID to satisfy the Equal Protection Clause. *See Salyer,* 410 U.S. at 730–32, 93 S.Ct. at 1230–32. Business activity contributes a great deal to a state, from employment of its citizens to revenue generated through taxes that help finance its budget. The services provided by GCDMA, as discussed above, are of a nature and quality that predominantly seek to improve and promote business activity in the district. The assessment, paid only by property owners, is a primary means of financing the services and improvements the GCP and GCDMA provide. The New York State Legislature could therefore reasonably conclude that property owners would not have agreed to subject their property to such an assessment unless they had a dominant role in determining how that revenue would be allocated. *See id.,* 410 U.S. at 731, 93 S.Ct. at 1231. Moreover, unlike *Salyer* and *Ball,* non-property owners, including residential and commercial tenants, are not disenfranchised, they just cannot hold a majority of seats on the Board. This voting scheme bears a reasonable relationship to the functions of BIDs and does not violate the Equal Protection Clause.

**IV. CONCLUSION**

Because the GCDMA serves a special limited purpose that disproportionately affects property owners, the election of the GC BID Board is not subject to the one-person, one-vote requirement of the Equal Protection Clause. Under the special limited purpose doctrine, the voting scheme for the Board, as found in GML § 980–m(b), Admin. Code § 25–414(b), and the GCDMA Bylaws, does not offend the Equal Protection Clause because it reasonably relates to the purpose of the BID.

While it may be difficult to "decide when experimentation and political compromise have resulted in an impermissible delegation of [ ] governmental powers, . . . state legisla-

tures, responsive to the interests of all the people, normally are better qualified to make this judgment than federal courts." *Ball,* 451 U.S. at 373, 101 S.Ct. at 1822 (Powell, J., concurring) (footnote omitted). The New York State legislature has made such a judgment by creating BIDs. Moreover, today's decision will not leave Plaintiffs without a remedy for their grievance. Because Plaintiffs are qualified voters in New York, they are equal participants in the election of the state and local government officials who created and have the power to change the statutory voting scheme that controls the election of the Board. *See id.,* at 371 n. 20, 101 S.Ct. at 1821 n. 20.

For the reasons stated above, Plaintiffs' motion for summary judgment is denied. Defendant and Intervenor–Defendants' cross-motions for summary judgment are granted. The Clerk of the Court is directed to enter judgment in favor of Defendant and Intervenor–Defendants.

SO ORDERED.